UNITED STATES, Appellant

v

RAMON P. SMITH, Staff Sergeant, U. S. Air Force, Appellee

13 USCMA 105, 32 CMR 105

*Lieutenant Colonel Simpson M. Woolf* argued the cause for Appellant, United States. With him on the brief was *Colonel Merlin W. Baker.*

*Major William A. Crawford, Jr.,* argued the cause for Appellee, Accused. With him on the brief was *Colonel Joseph E. Krysakowski.*

## Opinion of the Court

KILDAY, Judge:

A general court-martial convened at Tachikawa Air Base, Japan, tried accused upon a charge of committing a lewd and lascivious act upon the body of his adopted seven-year-old daughter, in violation of Article 134 of the Uniform Code of Military Justice, 10 USC § 934. In the course of those proceedings and, prior to the receipt of other testimony, the law officer received into evidence the pretrial statement of the accused. It will suffice to point out that accused's confession contained statements fully adequate to establish his guilt of the offense charged.

The child against whom the offense is alleged to have been committed did not testify. Nor was her mother produced at the trial. The only evidence as to the crime offered by the Government, other than accused's confession, was the testimony of three Air Force medical officers stationed at the base hospital, who had examined the child.

Dr. Burnell, medical officer of the day, examined the alleged victim during the wee morning hours of February 25, 1961, and called in Dr. Heyburn, who was also on duty, to assist. Dr. Burnell stated the child had a bruise on the left side of her face which resembled the shape of a hand. Further examination revealed a fresh tear and evidence of bleeding in the perineal area. The tear was about one and one-half centimeters in length and was a "few hours" old. Dr. Burnell's opinion

was that the tear had been caused by external force of an instrument which was probably blunt in nature. It could have been due to a blow or cut or anything of the sort; it could also have been caused by an erect male organ or any of numerous other things.

Dr. Heyburn saw the child shortly thereafter on the same night and noted a bruise similar to a handprint on her cheek. His examination of the perineal area, like that of his colleague, also disclosed the fissure. Additionally, there was a bruise in that area. In Dr. Heyburn's opinion, the tear had been caused within two or three hours prior to the examination and was due to external trauma. It could not have been caused by an internal force such as a hard stool. The tear could have been caused, he opined, by forcefully applying an erect male organ against the area; but it could also have been caused by any number of objects.

Dr. Sweigard, pediatrician at the hospital, examined the child later on the morning of February 25, 1961. He noted the handshaped bruise on the cheek which he characterized as "fresh." And he, too, noted a fissure adjacent to the anus which he thought most likely resulted from external trauma. He also testified the injury could have been due to internal or an external force, although it was more likely caused by the latter. In his view, it could have been caused by anything that stretched the skin beyond its usual elastic capacities; it could

have resulted from numerous things, including a fall on some object.

The accused did not testify and, after adducing evidence pertaining to mental responsibility and intoxication, the defense rested.

Upon the evidence recounted above and his confession, the court-martial found accused guilty and sentenced him to a dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for five years.

In his post-trial review the staff judge advocate concluded that the evidence of record, *aliunde* the accused's confession, fell short of meeting the military rule which requires a showing that the offense charged was probably committed by someone. Therefore, he recommended that the conviction and punishment be disapproved and a rehearing ordered. The convening authority, however, rejected the recommendation of the staff judge advocate and approved the findings and sentence.

The board of review reached the same conclusion as the staff judge advocate. It held that the corroboration of accused's confession was insufficient and that the law officer erred in permitting the court-martial to consider the same. Accordingly, the board set aside the findings of guilty and the sentence and dismissed the charge.

The Acting The Judge Advocate General of the Air Force has certified, under Article 67(b)(2), Uniform Code of Military Justice, 10 USC § 867, two issues for decision by this Court. The first question inquires:

"WAS THE BOARD OF REVIEW CORRECT IN HOLDING THAT AS A MATTER OF LAW THE COURT-MARTIAL SHOULD NOT HAVE BEEN PERMITTED TO CONSIDER THE ACCUSED'S CONFESSION?

Government counsel contend, in the first instance, that the corroboration in this case is sufficient when tested by the rule prescribed in paragraph 140a of the Manual for Courts-Martial, United States, 1951. Second, they assert that the corroborative evidence is sufficient when tested under the rule adopted by the Supreme Court of the United States in the case of Opper v

United States, 348 US 84, 99 L ed 101, 75 S Ct 158 (1954).

The first contention need not delay us, as we are in agreement with the holding of the board of review. As we view the record, the evidence in corroboration of the accused's confession is insufficient, under the standards required by paragraph 140a of the Manual, supra, as the same have been construed and applied by the decisions of this Court, to establish the probability that the offense charged was committed. See United States v Isenberg, 2 USCMA 349, 8 CMR 149; United States v Petty, 3 USCMA 87, 11 CMR 87; United States v Dolliole, 3 USCMA 101, 11 CMR 101; United States v Manuel, 3 USCMA 739, 14 CMR 157; United States v Williams, 4 USCMA 241, 15 CMR 241; United States v Landrum, 4 USCMA 707, 16 CMR 281; United States v Villasenor, 6 USCMA 3, 19 CMR 129; United States v Leal, 7 USCMA 15, 21 CMR 141; United States v Mims, 8 USCMA 316, 24 CMR 126; United States v McFerrin, 11 USCMA 31, 28 CMR 255; United States v Young, 12 USCMA 211, 30 CMR 211. Cf. United States v Fioco, 10 USCMA 198, 27 CMR 272.

We next proceed to a discussion of whether this Court should, or, conforming to Article 36, Uniform Code of Military Justice, 10 USC § 836, and paragraph 140a of the Manual, supra, may, adopt the rule enunciated by the Supreme Court in Opper v United States, supra.

Appellate Government counsel candidly acknowledge that this Court has previously had the rule announced in *Opper* urged upon it "as one which commends itself for adoption by the military justice system." Counsel for the Government also concede that this Court has consistently refused to adopt such rule. However, they point out that members of the Court have not reached a common ground for their decisions. In effect, it is pointed out that, with changes in the composition of the Court, different reasons have been expressed for their holdings by different Judges. It is quite true that

108

different reasons have been expressed; however, a majority of the Court has always sustained the rule as delineated in paragraph 140*a* of the Manual for Courts-Martial.

This rule of military law being so well settled, it would appear that application of the principle of *stare decisis* is particularly well suited to the case at bar. See United States v Young, supra. However, in view of the Government's insistence and the fact that another change in composition of the Court has taken place and, because it may be helpful to examine, in more detail, some of the background which gives support to the conclusions we reach, it is deemed appropriate to review the previous holdings.

The question first received the attention of this Court early in its history. United States v Brooks, 1 USCMA 88, 1 CMR 88; United States v Uchihara, 1 USCMA 123, 2 CMR 29; United States v Goodman, 1 USCMA 170, 2 CMR 76. And it was discussed at length in United States v Isenberg, supra, decided some ten years ago. Parenthetically, we point out that United States v Opper, supra, was not decided by the Supreme Court until more than two years subsequently.

In a very able opinion in *Isenberg,* Judge Latimer of this Court analyzed the Federal and state decisions and pointed out:

"It is a cardinal principle of law that a conviction may not be sustained unless there is some evidence corroborating any admissions or confessions made by the accused. The weight of this independent evidence, however, has posed the problem. The holdings, as to how far it must go, vary from a requirement that the evidence may be of any sort whatever which might prove the truthfulness of the confession, to the requirement that some evidence of each element of the offense charged be shown. Wigmore, Evidence, 3d ed, § 2070, page 394. A study of the Federal cases and provisions of the Manual for Courts-Martial, United States, 1951, shows an apparent tran-sition from the former to the latter." [2 USCMA at page 351.]

The opinion cited and quoted from Daeche v United States, 250 Fed 566 (CA 2d Cir) (1918), as sustaining the concept that any evidence which will support the truthfulness of the confession is sufficient corroboration. However, it was pointed out that in Forte v United States, 94 F2d 236 (1937), the United States Court of Appeals for the District of Columbia announced a different standard, stating:

". . . there can be no conviction of an accused in a criminal case upon an uncorroborated confession, and the further rule, represented by what we think is the weight of authority and the better view in the Federal courts, that such corroboration is not sufficient if it tends merely to support the confession, without also embracing substantial evidence of the *corpus delicti* and the whole thereof. We do not rule that such corroborating evidence must, independent of the confession, establish the *corpus delicti* beyond a reasonable doubt. It is sufficient, according to the authorities we follow, if, there being, independent of the confession, substantial evidence of the *corpus delicti* and the whole thereof, this evidence and the confession are together convincing beyond a reasonable doubt of the commission of the crime and the defendant's connection therewith."

Judge Latimer than made reference to provisions in various Manuals for Court-Martial, U. S. Army, from 1921 through 1949, and cited military cases before boards of review during that period. It was concluded that it could hardly be said a clear-cut, definite, and precise rule had been announced by the military authorities. With military authorities in this condition of uncertainty, and no doubt to give firm posture to some rule, the Manual for Courts-Martial, United States, promulgated by the President in 1951, prescribed in paragraph 140*a*, at page 251, as follows:

"An accused cannot legally be convicted upon his uncorroborated con-

fession or admission. A court may not consider the confession or admission of an accused as evidence against him unless there is in the record other evidence, either direct or circumstantial, that the offense charged had probably been committed by someone. Other confessions or admissions of the accused are not such corroborative evidence."

This Court assessed the evidence in *Isenberg*, supra, against the above-quoted Manual provision, found the test had not been met, and reversed the finding of guilty. While Judge Latimer, with whom Chief Judge Quinn concurred, followed the Manual rule meticulously, he did not further discuss the manner in which this Court was bound by the same. The late Judge Brosman concurred in the result reached by the majority and concluded a separate opinion with the following paragraph:

"It must be apparent that I question the desirability of what I am sure the Manual has done. However, we are bound by its terms, and the remedy must lie elsewhere." [2 USCMA at page 357.]

Thereafter, this Court on a number of occasions considered the question of the sufficiency of the evidence, exclusive of the confession, required to corroborate the same, and adhered to the principle announced in *Isenberg*. The entire question, however, was taken up anew by this Court in United States v Villasenor, 6 USCMA 3, 19 CMR 129. That case, it should be mentioned, was decided after the opinion in Opper v United States, supra, in which the Supreme Court announced:

". . . we think the better rule to be that the corroborative evidence need not be sufficient, independent of the statements, to establish the corpus delicti. It is necessary, therefore, to require the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement. . . . It is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth."

It is therefore evident that the Supreme Court had, essentially, adopted the principle enunciated in the *Daeche* case, supra, while paragraph 140a of the Manual adheres to the rule stated in Forte v United States, supra.

In *Villasenor*, Government counsel urged this Court to retreat from the position announced in *Isenberg* and followed in subsequent cases, and adopt for the military the rule prescribed by the Supreme Court in *Opper*. This Court, in an opinion by Judge Latimer, with the full concurrence of Judge Brosman, announced that it was not free so to do. That opinion states:

". . . We have consistently recognized that where a Manual provision does not lie outside the scope of the authority of the President, offend against the Uniform Code, conflict with another well-recognized principle of military law, or clash with other Manual provisions, we are duty-bound to accord it full weight. We have done so on numerous occasions and in various settings." [6 USCMA at page 7.]

The following cases are cited in that connection: United States v Lucas, 1 USCMA 19, 1 CMR 19; United States v Adamiak, 4 USCMA 412, 15 CMR 412; United States v Smith, 5 USCMA 314, 17 CMR 314; United States v Kunak, 5 USCMA 346, 17 CMR 346. The opinion then proceeds:

". . . Tested by those standards, there is nothing in the Manual itself which is inconsistent with the provision at issue here, this rule does not contravene any portion of the Code, it is not contrary to any long-established military principle, and the President is expressly empowered to prescribe the rules of procedure to be followed by courts-martial, 'including modes of proof.' Article 36, Uniform Code of Military Justice, 50 USC § 611. It necessarily follows that whatever may be the effect of Opper v United States, supra, elsewhere, the question is not an open one here."

In *Villasenor*, Chief Judge Quinn concurred in the result, but stated:

"I doubt that the rule requiring corroboration of a confession is a mere mode of proof. I would follow the rule announced by the United States Supreme Court in Opper v United States, 348 US 84, 99 L ed 104, 75 S Ct 158. The Manual is not binding on us when it conflicts with the law." [6 USCMA at page 13.]

Thereafter, United States v Mims, 8 USCMA 316, 24 CMR 126, was decided by this Court in 1957. At that time Judge Ferguson had succeeded the late Judge Brosman and the Government again urged this Court to retreat from its previous holdings in this area. Judge Latimer referred to the opinion in *Villasenor*, expressly approved the holding, and announced that "we stand firm on that rule."

Judge Ferguson, in *Mims,* concurred in the result. He joined in approving the more stringent rule spelled out in the present Manual, but expressed his reservations and the reasons for his limited concurrence in this language:

". . . I do so because I consider the corpus delicti rule expressed in the Manual for Courts-Martial, United States, 1951, paragraph 140*a*, a better rule for the military than that laid down in Opper v United States, 348 US 84, 75 S Ct 158, 99 L ed 101. This separate concurrence is necessary in view of the implication in the principal opinion that this Manual rule is binding on this Court. The opinion refers to United States v Villasenor, 6 USCMA 3, 19 CMR 129, which specifically so holds.

"The test for proof of the corpus delicti is in the area of legal sufficiency and therefore subject to approval by this Court. The Manual treatment of questions of criminal law has never been considered to be binding on this Court. United States v Jenkins, 7 USCMA 261, 22 CMR 51. This Court, as the court of last resort in the military, has the exclusive jurisdiction to set the law in such areas in the absence of action by the Congress. Fisher v United States, 328 US 463, 66 S Ct 1318, 90 L ed 1382." [8 USCMA at page 319.]

Chief Judge Quinn dissented. He opined in *Mims* that:

"The requirement that a confession must be corroborated is satisfied if 'substantial independent evidence which would tend to establish the trustworthiness' of the confession is introduced. Opper v United States, 348 US 84, 93, 99 L ed 101, 75 S Ct 158. The independent evidence need not itself establish criminality. Here, there were marks of several needle punctures on the accused's arm. True, these marks might be attributed to an innocent cause, but they also constitute substantial evidence establishing the trustworthiness of the accused's statement to the Office of Special Investigations agent that on the previous day he had taken an injection of heroin in the hospital ward shower room. I would, therefore, affirm the decision of the board of review." [8 USCMA, pages 319 and 320.]

Later, in United States v McFerrin, 11 USCMA 31, 28 CMR 255, decided November 20, 1959, Judge Latimer, with the full concurrence of Judge Ferguson, specifically adhered to the holding in the *Villasenor* and *Mims* cases, supra, and other decisions of this Court previously cited herein. Chief Judge Quinn again dissented, but contented himself with the observation that "In my opinion, there is sufficient independent evidence to justify admission of the accused's confession." 11 USCMA at page 36.

Most recently, in United States v Young, 12 USCMA 211, 30 CMR 211, Judge Ferguson, with concurrence by Chief Judge Quinn and Judge Latimer, stated:

"It is settled military law that, in order to sustain findings of guilty, an accused's confession must be corroborated by substantial, independent evidence tending to establish the existence of each element of the offense charged."

At this point the opinion cites *Isenberg, Landrum, Villasenor, Mims,* and *McFerrin,* all supra, and goes on to observe:

". . . This proof may be circum-

stantial or direct. United States v Petty, 3 USCMA 87, 11 CMR 87. The question before us, therefore, is simply whether the evidence *aliunde* accused's statements meets this standard. We are certain that it does."

Chief Judge Quinn, it may be noted, attached no qualification to his concurrence in *Young*. However, candor requires that it be pointed out evidence sufficient to sustain a conviction under the Manual rule would, of necessity, be more than abundant to sustain a conviction when tested by *Opper*.

A review of all of the decisions of this Court establishes the fact that, prior to the decision of the Supreme Court in Opper v United States, supra, the Judges of this Court were unanimous in following paragraph 140*a*, Manual for Courts-Martial, supra, as to the corroborating evidence, *aliunde* a confession, necessary to show a crime was probably committed. Also, since the *Opper* opinion, a majority of this Court has refused to adopt the test there prescribed and has consistently adhered to the Manual rule. The composition of the majority has changed with the membership of the Court, however, and the reason stated for adhering to the Manual rule has been different on occasion.

A very careful analysis of the opinions seems to suggest that the difference of viewpoint has been more apparent than real. As an example, in *Villasenor* Chief Judge Quinn stated, "I doubt that the rule requiring corroboration of a confession is a mere mode of proof." In *Mims* Judge Ferguson stated: "The Manual treatment of questions of criminal law has never been considered to be binding on this Court."

It is this writer's view that the rule that no person shall be convicted of crime upon his confession unless and until the same is corroborated is a sound principle of law; it is a valuable right of the accused and a great protection to him. Proof of ■ the *corpus delicti* is fundamental in every criminal prosecution, and its existence must be shown, just as all other elements; that

is, by legal and competent evidence. Judge Latimer rather effectively so stated in *Isenberg*, supra, and it may be helpful to emphasize a portion of the language of that opinion, already quoted hereinbefore:

"It is a cardinal principle of law that a conviction may not be sustained unless there is some evidence corroborating any admissions or confessions made by the accused. *The weight of this independent evidence, however, has posed the problem.*" [Emphasis supplied.]

While the presence or absence of a *corpus delicti,* or the necessity that there be evidence to ■ corroborate a confession, seems clearly to be a matter of substantive law, text writers, legal encyclopedias, and other authorities seem generally to consider the proof thereof to be a rule of procedure or a rule of evidence. Thus, Clark and Marshall, A Treatise on the Law of Crimes, 6th ed, § 2.04, observes:

"Despite its procedural overtones corpus delicti should be noted in this text on substantive criminal law."

And some other texts on substantive criminal law do not treat on the subject of *corpus delicti*. See Perkins, Criminal Law (1957).

Dean Wigmore, in section 2073 (b) and (c) of his work on Evidence, 3d ed, treats the necessity for corroboration of an accused's confession in establishing the *corpus delicti* as a "rule of Evidence." See also McCormick, Evidence (1954), § 110; and Underhill, Criminal Evidence, 5th ed, §§ 35 and 36. Further, in 23 CJS, Criminal Law, § 916 (2), we read:

"The corpus delicti cannot be presumed. To sustain a conviction the evidence must be sufficient to establish the corpus delicti, that is, to show the commission of the crime charged. The corpus delicti must be established by legal evidence, it may not be established by mere hearsay evidence; . . . The law demands only the best proof of the corpus delicti which in the nature of the case is attainable."

See also Underhill, Criminal Evidence, supra, § 37.

It would seem clear that as a factor essential to the offense and a matter to be proved, the *corpus delicti* is to be proved under the laws of evidence. There is a manifest difference between the essentiality of the *corpus delicti*, which is a substantive matter, and the mode or manner of its proof. The latter is a matter of the laws of evidence. Parenthetically, the word mode and the word manner are, in this context, synonymous. Black's Law Dictionary, 4th ed, pages 1115 and 1155; Webster's New International Dictionary, 2d ed, pages 1497 and 1576.

In the trial of a criminal case in Federal civilian courts it is necessary that the *corpus delicti* be proved. See Smith v United States, 348 US 147, 153, 154, 99 L ed 192, 75 S Ct 194 (1954). The same is true in the trial of a case before a court-martial. It is so recognized by paragraph 44*f* (3), Manual for Courts-Martial, United States, 1951, which provides that:

". . . As to each offense charged, the burden is on the prosecution to prove beyond a reasonable doubt by competent evidence *that the offense was committed*, that the accused committed it, that he had the requisite criminal intent at the time, and that the accused is within the jurisdiction of the court, except to the extent that such burden is relieved by a plea of guilty." [Emphasis supplied.]

It should be remembered, however, that the above provision makes use of a different standard of proof than paragraph 140*a*. The former involves convincing the triers of fact beyond reasonable doubt that a crime was committed. The portion of paragraph 140*a* under consideration, of course, does not involve so stringent a requirement. Rather, the test in the latter instance is one of probability. Moreover, paragraph 140*a* comes into play only when a confession of the accused is relied upon by the prosecution. In that instance, the latter provision determines the evidence required, independent of the confession, to establish the *corpus·delicti*. This is the showing required on the interlocutory question of the admission of the confession and its consideration by the court-martial, not the proof essential to the final disposition of the case. In that connection and, as a matter of substantive law, it should be borne in mind that a confession is, as this Court has long recognized, the strongest order of proof and, together with the other ·evidence, establishes almost compellingly both that the crime was committed and the identity of the perpetrator. See United States v Monge, 1 USCMA 95, 2 CMR 1.

Thus, apart from the·first sentence of the quoted provision under consideration, which proscribes convictions based on uncorroborated confessions and appears to set forth a well recognized substantive principle, the rule announced in paragraph 140*a* is purely evidentiary. When, consonant with the test there prescribed, it is first shown an offense probably was committed by someone, then the extrajudicial confession may properly be admitted into evidence and considered by the triers of fact in deliberating whether they are convinced beyond reasonable doubt that the crime charged was committed and that accused was its perpetrator.

We next consider the nature, extent, and the legal status of that portion of paragraph 140*a* of the Manual heretofore quoted. Article 36 of the Uniform Code, supra, reads in pertinent part as follows:

"(a) The procedure, including modes of proof, in cases before courts-martial . . . may be prescribed by the President by regulations . . . which may not be contrary to or inconsistent with this chapter.

"(b) All rules and regulations made under this article shall be uniform insofar as practicable and shall be reported to Congress."

By virtue of the authority vested in him by the Act of May 5, 1950, establishing a "Uniform Code of Military Justice," the President prescribed by Executive Order 10214 of February 8, 1951, the "Manual for Courts-Martial, · United States, 1951." Paragraph 140*a* is, of course, included therein.

Article 36 of the present Code, we note, is essentially a re-enactment of Article of War 38, as provided by the Act of August 29, 1916, 39 Stat 656. This constituted the first express delegation by the Congress to the President of the authority, by regulation, to prescribe modes of proof before courts-martial. The rules of evidence for the Army were first prescribed in the Manual for Courts-Martial, U. S. Army, 1917. Prior to that time Army courts-martial proceeded in accordance with the rules of evidence at common law, with exceptions making those rules more adaptable to the procedures of courts-martial. Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 313.

Article of War 38, supra, we note, was carried, under the same number and in essentially the same language, into the 1920 Articles of War. 41 Stat 794. Similarly, when those Articles were amended by the Elston Act, in 1948, the same provision, with but very minor added verbiage, was retained in Article of War 38. 62 Stat 632. And Article 36 of the present Code, supra, is a substantial re-enactment of its immediate precursor statute.

No statutory provision regarding rules of evidence for the Navy prior to the Uniform Code has been brought to our attention. Further, in "Military Justice under the Uniform Code" by James Snedeker (1953), a footnote at page 306–307, comments that "the prescription of the procedure and rules of evidence for naval general courts-martial was never specifically provided for by Congress."

With that background in mind, we turn our attention to the fundamental authority for legislation of the kind in question. In that connection, reference to the Constitution of the United States is enlightening. Article I, Section 8, Clause 14, thereof provides:

"The Congress shall have Power . . . To make Rules for the Government and Regulation of the land and naval Forces."

Clause 12 of Section 8 gives Congress power "To raise and support Armies"; and Clause 13 thereof grants power "To provide and maintain a Navy." Further, through Clause 18, Section 8 of Article I, Congress has the power:

"To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

In view of the sweeping power given Congress to make laws under the last cited provision, we need to inquire whether reasons existed for the special grant of authority in Clause 14 of Section 8, Article I, "To make Rules for the Government and Regulation of the land and naval Forces." We should also bear in mind the juxtaposition of the powers to raise armies, provide a navy, and make rules for the government of such. There were indeed, as we shall see, cogent reasons for these specific grants and for their close relationship in the text of the Constitution.

The influence of Blackstone's Commentaries on the membership of the Constitutional Convention was great and that influence is reflected in the text of the Constitution. Blackstone was the chief, and in many parts of this country almost the only, source of knowledge of English law; his Commentaries were, in the American Colonies, the oracle of law. Essays No. 24 through 29 of "The Federalist" are accredited to Alexander Hamilton and they draw heavily on Blackstone for an explanation, and defense, of the Constitutional provisions as to the military.

As background for a better understanding of these provisions of the Constitution and the understanding of members of the convention of the existing English law, we refer to 1 Blackstone's Commentaries, page 262 (Wendell edition 1857). It is to be remembered, of course, that the Commentaries were published in the late 1760's. We quote:

"The king is considered, in the next place, as the generalissimo, or the first in the military command, within the kingdom. The great end of society is to protect the weakness

of individuals by the united strength of the community; and the principal use of government is to direct that united strength in the best and most effectual manner, to answer the end proposed. Monarchical government is allowed to be the fittest of any for this purpose; it follows, therefore, from the very end of its institution, that in a monarchy the military power must be trusted in the hands of the prince.

"In this capacity, therefore, of general of the kingdom, the king has the sole power of raising and regulating fleets and armies. Of the manner in which they are raised and regulated I shall speak more when I come to consider the military state. We are now only to consider the prerogative of enlisting and of governing them, which, indeed, was disputed and claimed, contrary to all reason and precedent, by the Long Parliament of King Charles I.; but, upon the restoration of his son, was solemnly declared by statute 13 Car. II, c. 6, to be in the king alone; for that the sole supreme government and command of the militia within all his majesty's realms and dominions, and of all forces by sea and land, and of all forts and places of strength, ever was and is the undoubted right of his majesty, and his royal predecessors, kings and queens of England, and that both or either house of Parliament can not, nor ought to, pretend to the same."

It will be noted that Blackstone discussed the raising of fleets and armies along with the regulation of them. It is obviously no happenstance, then, that the Constitution followed the grant of power to raise armies and maintain a navy with the power in the Congress to govern and regulate them.

After having clothed the King with absolute power to raise and regulate, Blackstone spoke in more detail of the manner in which the King exercised his right to regulate and govern the military. In Volume I of the Wendell edition, at page 416, we find the following:

". . . This discretionary power of the court-martial is, indeed, to be guided by the directions of the crown; which, with regard to military offenses, has almost an absolute legislative power. 'His majesty,' says the act, 'may form articles of war and constitute courts-martial, with power to try any crime by such articles, and inflict penalties by sentence or judgment of the same.' A vast and most important trust! an unlimited power to create crimes, and annex to them any punishments not extending to life or limb. These are, indeed, forbidden to be inflicted, except for crimes declared to be so punishable by this act; which crimes we have just enumerated, and among which we may observe that any disobedience to lawful commands is one. Perhaps in some future revision of this act, which is in many respects hastily penned, it may be thought worthy the wisdom of Parliament to ascertain the limits of military subjection, and to enact express articles of war for the government of the army, as is done for the government of the navy; especially as, by our present Constitution, the nobility and gentry of the kingdom, who serve their country as militia officers, are annually subjected to the same arbitrary rule during their time of exercise."

And at page 419 in the same volume he goes on to state:

". . . In these articles of the navy almost every possible offense is set down, and the punishment thereof annexed; in which respect the seamen have much the advantage over their brethren in the land-service, whose articles of war are not enacted by Parliament, but framed from time to time at the pleasure of the crown. Yet from whence this distinction arose, and why the executive power, which is limited so properly with regard to the navy, should be so extensive with regard to the army, it is hard to assign a reason; unless it proceeded from the perpetual establishment of the navy, which rendered a permanent law for their regulation expedient; and the temporary duration of the army, which subsisted only from year to year, and might, therefore, with less danger be sub-

jected to discretionary government. But whatever was apprehended at the first formation of the Mutiny Act, the regular renewal of our standing force at the entrance of every year has made this distinction idle. For, if from experience past we may judge of future events, the army is now lastingly ingrafted into the British Constitution; with this singularly fortunate circumstance, that any branch of the legislature may annually put an end to its legal existence, by refusing to concur in its continuance."

Joseph Story's "Commentaries on the Constitution of the United States," which was first published in the early 1830's, is also illuminating. In the 4th edition (1873), we find the following passage in § 1187, at page 96 of volume 2:

". . . Our notions, indeed, of the dangers of standing armies, in time of peace, are derived in a great measure from the principles and examples of our English ancestors. In England, the king possessed the power of raising armies in the time of peace according to his own good pleasure. And this prerogative was justly esteemed dangerous to the public liberties. Upon the revolution of 1688, Parliament wisely insisted upon a bill of rights, which should furnish an adequate security for the future. But how was this done? Not by prohibiting standing armies altogether in time of peace; but (as has been already seen) by prohibiting them *without the consent of Parliament.* This is the very proposition contained in the Constitution; for the Congress can alone raise armies; and may put them down, whenever they choose."

Story comments further, in § 1197 of the same work, at page 108:

"The next power of Congress is 'to make rules for the government and regulation of the land and naval forces.' This is a natural incident to the preceding powers to make war, to raise armies, and to provide and maintain a navy. Its propriety, therefore, scarcely could be, and never has been denied, and need not now be insisted on. The clause was not in the original draft of the Constitution; but was added without objection by way of amendment. It was, without question, borrowed from a corresponding clause in the articles of confederation, where it was with more propriety given, because there was a prohibition of all implied powers. In Great Britain, the king, in his capacity of generalissimo of the whole kingdom, has the sole power of regulating fleets and armies. But Parliament has repeatedly interposed; and the regulation of both is now in a considerable measure provided for by acts of Parliament. The whole power is far more safe in the hands of Congress than of the executive; since, otherwise, the most summary and severe punishments might be inflicted at the mere will of the executive."

Attention is also directed to "The Constitution of the United States of America, Annotated," 1952, prepared by the Library of Congress and edited by Corwin. The following annotation, which we consider an authoritative statement of our constitutional system, appears at page 283 therein:

"The clauses of the Constitution which give Congress authority 'to raise and support armies, to provide and maintain a navy' and so forth, were not inserted for the purpose of endowing the National Government with power to do these things, but rather to designate the department of government which should exercise such powers. Moreover, they permit Congress to take measures essential to the national defense in time of peace as well as during a period of actual conflict. That these provisions grew out of the conviction that the Executive should be deprived of the 'sole power of raising and regulating fleets and armies' which Blackstone attributed to the King under the British Constitution, was emphasized by Story in his Commentaries."

See also, for an informative discussion of constitutional powers, United States v Curtiss-Wright Export Corp., 299 US 304, 81 L ed 255, 57 S Ct 216 (1936).

It is clear from the text of the Constitution, writings contemporaneous with its adoption, commentaries on it, and decisions of the Supreme Court subsequent to its adoption that, in the military field, the powers attributed to the King by Blackstone were distributed to the President and to the Congress. The President succeeded the King, who commanded fleets and armies, and was made Commander-in-Chief of the Army and Navy of the United States, and of the militia of the several States, when called into the actual service of the United States. But the King's power to raise armies, provide a navy and to make rules for the government and regulation of the land and naval forces, was transferred from the Executive to the Legislative branch of government.

The language of the Constitution makes the President Commander-in-Chief of the Armed Forces and puts no limitation on his power in this capacity. Indeed, the paucity of the words exemplifies the totality of his authority in that respect. The identical situation exists in the provision granting the power to Congress "To make Rules for the Government and Regulation of the land and naval Forces." There is no limitation in the constitutional language giving this power to Congress. As Story observed in that section of his commentaries last quoted hereinbefore:

"Its propriety, therefore, scarcely could be, and never has been denied, and need not now be insisted on."

Certainly—at least to our knowledge —the Supreme Court of the United States has never denied, questioned, or in any manner abridged this power of Congress. In fact, the nature and extent of the Congressional power to make rules for the government of the land and naval forces received the attention of the Supreme Court in the early case of Dynes v Hoover, 20 Howard 65 (US 1857). In the Court's opinion by Mr. Justice Wayne, it is stated:

"These provisions show that Congress has the power to provide for the trial and punishment of military and naval offenses in the manner then and now practiced by civilized na-

tions; and that the power to do so is given without any connection between it and the 3d article of the Constitution defining the judicial power of the United States; indeed that the two powers are entirely independent of each other."

Having established that the Constitution vests in Congress the power to make rules for the government and regulation of the armed forces, we must next consider the validity of a delegation by Congress to the President, or another agency of Government, of any portion of that power.

In Wayman v Southard, 10 Wheat 1 (US 1825), Mr. Chief Justice Marshall considered the question of delegation of power at considerable length. Involved in that case was a statute passed by Congress in 1789 which, among other things, provided " 'that all the said courts shall have power' 'to make and establish all necessary rules for the orderly conducting of business in the said courts, provided such rules are not repugnant to the laws of the United States'." The Chief Justice wrote for the Court:

"It will not be contended that Congress can delegate to the courts, or to any other tribunals, powers which are strictly and exclusively legislative. But Congress may certainly delegate to others, powers which the legislature may rightfully exercise itself. . . .

"The line has not been exactly drawn which separates those important subjects, which must be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions to fill up the details."

In Ex parte Reed, 100 US 13, 25 L ed 538 (1879), a member of the Navy sought release by habeas corpus from confinement imposed by a naval court-martial, Mr. Justice Swayne there said:

"The Secretary of the Navy is authorized to establish 'Regulations of the Navy,' with the approval of the

**117**

President. 12 Stat at L, 565; RS, sec 1547. Such 'Regulations for the Administration of Law and Justice' were issued on the 15th of April 1870.

. . .

. . . . .

"Such regulations have the force of law. Gratiot v US, 4 How, 80."

See also The United States v Eliason, 16 Peters 291 (US 1842).

In 1928, Chief Justice Taft in Hampton, Jr. & Co. v United States, 276 US 394, 72 L ed 624, 48 S Ct 348, considered in great detail the validity and extent of delegation of legislative power and analyzed cases in the Supreme Court and many state decisions. He there stated for a unanimous Court:

"The well-known maxim 'delegata potestas non potesta delegari,' applicable to the law of agency in the general and common law, is well understood and has had wider application in the construction of our Federal and state Constitutions than it has in private law. Our Federal Constitution and state Constitutions of this country divide the governmental power into three branches. The first is the legislative, the second is the executive, and the third is the judicial, and the rule is that in the actual administration of the government Congress or the legislature should exercise the legislative power, the President or the state executive, the governor, the executive power, and the courts or the judiciary the judicial power, and in carrying out that constitutional division into three branches it is a breach of the national fundamental law if Congress gives up its legislative power and transfers it to the President, or to the judicial branch, or if by law it attempts to invest itself or its members with either executive power or judicial power. This is not to say that the three branches are not coordinate parts of one government and that each in the field of its duties may not invoke the action of the two other branches in so far as the action invoked shall not be an assumption of the constitutional field of action of another branch. In determining what it may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination.

"The field of Congress involves all and many varieties of legislative action, and Congress has found it frequently necessary to use officers of the executive branch within defined limits, to secure the exact effect intended by its acts of legislation, by vesting discretion in such officers to make public regulations interpreting a statute and directing the details of its execution, even to the extent of providing for penalizing a breach of such regulations."

Thus the rule is well established that Congress may delegate to the President, and other administrative officers, and to various agencies of government, the power to make regulations to fill up details and implement statutory provisions, or to determine the details of the legislative scheme. And, further, when regulations are so adopted, they "have the force of law."

For further expressions by the Supreme Court to sustain the proposition that regulations falling properly within a valid delegation of power by Congress have the force of law and, in addition to the authorities hereinbefore cited, we refer the interested reader to United States v Rock Royal Co-Operative, 307 US 533, 83 L ed 1446, 59 S Ct 993 (1938); Standard Oil Co. of California v Johnson, 316 US 481, 86 L ed 1611, 62 S Ct 1168 (1942); Billings v Truesdell, 321 US 542, 88 L ed 917, 64 S Ct 737 (1944); Miller v Arkansas, 352 US 187, 1 L ed 2d 231, 77 S Ct 257 (1956); Public Utilities Com. v United States, 355 US 534, 2 L ed 2d 470, 78 S Ct 446 (1958).

We conclude that Article 36, Uniform Code of Military Justice, supra, falls within the category considered above. Accordingly, we hold it is a valid delegation to the President of the power, by regulations, to prescribe the modes of proof before courts-martial.

That brings us to the critical question

in the case at bar: Whether paragraph 140a, supra, is a valid exercise of the power thus delegated and, as such, carrying the force of law. Some of the cases in this Court, in referring to paragraph 140a, state the same "is binding on this Court." This is possibly unfortunate language insofar as it may carry a connotation that this Court is in anywise bound by Presidential directives or regulations any more than is any other court. Manifestly, any such implication must be rejected. But, at the same time, we fully agree that a valid regulation promulgated by the President, in conformity with a power properly delegated to him by the Congress, has the force of law and is entitled to consideration by this Court, as by all others, in that light.

As pointed out previously, that portion of paragraph 140a stating "An accused cannot legally be convicted upon his uncorroborated confession or admission," appears to be substantive in nature. However, as has also been noted earlier, that is a well recognized, indeed, a cardinal principle. As such, it is stating the obvious to note that it does not suffer any diminution in validity because the President directed that it be included in the Manual. It must be remembered that in many instances facilities for legal research are not readily available, so it is wholly understandable—perhaps even desirable —that the Manual, as a handy compendium on military justice, include statements concerning substantive principles of law. The fact that it does so, however, neither adds nor detracts from the validity of the rule set forth, as Congress did not delegate to the President the authority to fix substantive rules. In any event, in this instance the principle set forth is clearly correct, so the matter need be of no concern to us.

What, then, of the balance of the Manual provision hereinbefore quoted? As we have previously noted, the mode and manner of proof of the so called *corpus delicti* is a matter of the

laws of evidence. Being such, it falls quite squarely within the authority delegated to the President by the Congress in Article 36 of the Uniform Code, supra. Accordingly, that portion of paragraph 140a, not being contrary to or inconsistent with the Code, and not conflicting with other Manual provisions or principles of military justice, is a valid exercise of the delegated power, and has the force of law.

We believe that Article 36 of the Uniform Code, supra, is similar to, and in some respects identical with, the Act of June 29, 1940, 54 Stat 688, Title 18, United States Code, formerly section 687, now section 3771, which provides:

"The Supreme Court of the United States shall have the power to prescribe, from time to time, rules of pleading, practice, and procedure with respect to any or all proceedings prior to and including verdict, or finding of guilty or not guilty by the court if a jury has been waived, or plea of guilty, in criminal cases and proceedings to punish for criminal contempt of court in the United States district courts . . . and in proceedings before United States commissioners. Such rules shall not take effect until they shall have been reported to Congress. . . ."

We also believe that paragraph 140a, Manual for Courts-Martial, supra, is an exercise of the power delegated to the President by Article 36 of the Code, similar to, or identical with the Rules of Criminal Procedure for the United States District Courts, adopted by the Supreme Court under the legislative authority above granted; and particularly similar to Rule 26 on evidence, Rule 27 on proof of official record, and Rule 28 on expert witnesses. And the Rules of Criminal Procedure adopted by the Supreme Court have the force of statutory law. Rattley v Irelan, 197 F2d 585 (CA DC Cir) (1952); Ochoa v United States, 167 F2d 341 (CA 9th Cir) (1948); United States v Watson, 146 F Supp 258 (DC DC) (1956).

The author Judge is in agreement with the conclusion of Judge Ferguson as expressed in United States v Mims, supra, that the rule expressed in para-

119

graph 140*a* of the Manual is a better one for the military than that laid down in Opper v United States, supra. Among other reasons for taking that view, I point out that many of those in the military are now serving by reason of compulsory laws; many are away from home, family, and friends for the first time; and many are of an age making them responsible in some jurisdictions only as juveniles. Further, military personnel to whom confessions are made are, in many instances, of higher rank than the one confessing, and certainly, if only by reason of their duties, tend to have great influence under the circumstances. Also, in the military one has no choice as to associates or neighbors but must eat, sleep, and live with the persons with whom assigned. And there are other reasons which seem to make it desirable that the facts showing the probability a crime was committed be proved under the more stringent rule. We can only surmise whether these or other factors have deterred the President from changing the mode of proof prescribed in the Manual, resulting in the recurring occasions upon which Government counsel have importuned this Court to retreat from its holdings in other cases involving paragraph 140*a*, supra.

However, I prefer to base my decision on the ground that regulations within a properly delegated legislative authority have the force of law, and we adhere to our previous holdings that paragraph 140*a*, Manual for Courts-Martial, United States, 1951, prescribes the rule for application in trials by courts-martial.

Testing the facts in this case by that provision, we hold the evidence was insufficient to corroborate the accused's confession. The proof, *aliunde* accused's statement, fails to show that the offense charged had probably been committed by someone. Accordingly, we answer the first certified question in the affirmative.

That determination requires that we consider the remaining question certified to us. It inquires:

"IF THE FIRST QUESTION IS ANSWERED IN THE AFFIRMATIVE, WAS THE BOARD OF REVIEW CORRECT IN DETERMINING THAT A REHEARING COULD NOT BE ORDERED?"

The resolution of this issue turns on the provision of Article 67(e), Uniform Code of Military Justice, 10 USC § 867. It is substantially identical with the rule spelled out in Articles 63(a) and 66(d) of the Code, 10 USC §§ 863 and 866, respectively, and it prescribes:

"If the Court of Military Appeals sets aside the findings and sentence, it may, except where the setting aside is based on lack of sufficient evidence in the record to support the findings, order a rehearing. If it sets aside the findings and sentence does not order a rehearing, it shall order that the charges be dismissed."

Paragraph 140*a* of the Manual, supra, quoted hereinbefore, sets forth the well recognized rule— albeit one of substance and not evidentiary—that an uncorroborated confession is legally insufficient to support a conviction. Indeed, without the requisite corroboration such confession should not even be admitted in evidence under the Manual provision. In our consideration of the first certified question, we analyzed the nature of the necessity for corroboration of a confession and concluded the Government's case against accused falls short when weighed in the balance against the appropriate standard. The instant record, then —under the Manual rule and even including accused's improperly admitted confession—does not, as a matter of law, support the findings of guilty. Accordingly, the board of review was correct in ordering the charges dismissed. United States v Mims, supra.

Both certified questions are answered in the affirmative and the decision of the board of review is affirmed.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

There is much in the principal opinion with which I fully agree. For example, I agree with the general de-

marcation of the respective powers of Congress and the President in the substantive and procedural areas of military justice. Unfortunately, however, I cannot accept the majority's construction of the President's exercise of one of his granted powers.

My first point of disagreement is with the meaning ascribed to the provision in the Manual for Courts-Martial, United States, 1951, on the extent of independent evidence required to corroborate a confession. Rather than begin with obeisance toward the rule of *stare decisis,* there is need for re-examination of fundamentals. As Judge Kilday ably points out, we appropriately start with the Manual. It recites the rule of independent corroboration in two sentences:

"An accused cannot legally be convicted upon his uncorroborated confession or admission. A court may not consider the confession or admission of an accused as evidence against him unless there is in the record other evidence, either direct or circumstantial, that the offense charged had probably been committed by someone." [Paragraph 140a.]

Most citations to the meaning of this provision go back to United States v Isenberg, 2 USCMA 349, 8 CMR 149. There Judge Latimer comprehensively reviewed earlier military and civilian applications of the rule of corroboration. He concluded that a short absence without authority constituted insufficient independent evidence to corroborate a confession of desertion. The *Isenberg* decision was interpreted as "adopting, at least in substance, the rule announced in Forte v United States, 94 F2d 236 (CA DC Cir)" which requires "some evidence . . . [on] each element of the offense charged." United States v Petty, 3 USCMA 87, 11 CMR 87. But neither *Isenberg,* nor its offspring United States v Villasenor, 6 USCMA 3, 19 CMR 129, purported to answer the question, "Why does the Manual require corroborative evidence as to each element of the offense charged?" As a matter of fact *Isenberg* expressly disclaimed any need to inquire into the "intent behind the deletion" from the 1951 Manual of language appearing in the 1949 Manual to the effect that the corroborative evidence *need not* cover every element of the offense. It is, I believe, at this point that the present opinion and its predecessors, like *Villasenor* and United States v Mims, 8 USCMA 316, 24 CMR 126, go astray. They assume the Manual prescribes an inflexible rule of evidence, separate and distinct from the corroborative rule followed in the Federal courts. That assumption is, in my opinion, unfounded and erroneous.

The first case in which this Court considered the corroborative rule was United States v Brooks, 1 USCMA 88, 1 CMR 88. The case was tried before the effective date of the 1951 Manual, and therefore the trial was governed by the procedural rules in the 1949 Manual. It will be recalled that the discussion of the corroboration requirements in the 1949 Manual indicated that the independent evidence did *not* need to extend to each element of the offense. Nevertheless, in a unanimous opinion, in United States v Brooks, we said there must be "substantial evidence of the corpus delicti other than the confession"; and we cited the *Forte* case to support the statement of the principle. How could we cite *Forte* in face of the 1949 provision that the evidence need not extend to each element of the offense? Was there a conflict between the 1949 Manual and *Forte* which we, *sub silentio,* resolved in favor of the latter? If so, were we wrong in applying the 1951 Manual to a trial begun under the 1949 procedures? Cf. United States v Sonnenschein, 1 USCMA 64, 1 CMR 64. Until the assumption of *Villasenor,* all these questions had consistent answers.

Underlying the decision in United States v Brooks, supra, and others to which I shall refer presently, is the idea that the Manual does not define a separate and distinct rule of evidence for military courts. Rather, it merely incorporates into military procedure the general rule prevailing in the regular Federal courts. This is the unarticulated but manifest premise in *Brooks.* It is also the basic premise in United States v Dolliole, 3 USCMA

101, 11 CMR 101, which was decided after *Isenberg*. There, we said, the Manual provision merely follows "the prevailing American law on the subject"; and we stated the rule in terms of the "slightly different wording" we used in United States v Evans, 1 USCMA 207, 2 CMR 113, another case decided before *Isenberg*. Quoting from our *Evans* opinion we said:

". . . A general statement of the standard to be applied to a given crime is difficult to formulate and legally unnecessary. We shall be satisfied if, for any crime, there is substantial evidence which makes it probable that the accused did not confess to an offense which never occurred."

Our reliance upon United States v Evans, supra, is significant because *Evans*, like *Brooks* before it, was tried while the 1949 Manual was still in effect. In its central purpose, therefore, *Dolliole* clearly contemplated continuity between the rule of corroboration described in the 1949 Manual and that set out in the 1951 Manual, despite differences in language between the two provisions. What was the nature of this continuity? The obvious answer is continuity of the intention that the Manual rule conform to the regular Federal rule.

Two circumstances convince me that the corroboration evidence discussion in the Manual does not promulgate a separate and inflexible rule of procedure for military courts, but merely intends, as we said in the *Petty* case, to adopt the prevailing Federal rule, whatever that rule happens to be. First, is the statement of intention by the draftsmen of the Manual. They say that the part of the Manual provision in issue "contains various rules of common application in the Federal courts." Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951,

page 216. Next, is the text of the provision itself. It consists, as I noted earlier, of only two sentences. The first sentence says an accused "cannot legally be convicted upon his uncorroborated confession or admission." That sentence is not the declaration of a procedural rule, but a statement of a fundamental rule of American substantive law. The second sentence says that the court-martial "may not consider the confession" unless there is independent evidence "that the offense charged had probably been committed by someone." This provision has been construed as adopting, for military courts, the rule of corroboration then prevailing in the regular Federal courts. United States v Petty, supra; see also my dissent in United States v Uchihara, 1 USCMA 123, 2 CMR 29.

Until Opper v United States, 348 US 84, 99 L ed 101, 75 S Ct 158, it was generally agreed that the prevailing rule was that set out in the *Forte* case, which was decided by the United States Court of Appeals for the District of Columbia Circuit. In *Opper*, however, the Supreme Court held that the "better rule" does not require "independent evidence of the corpus delicti." Consequently, since the *Opper* decision, the prevailing rule in the Federal courts does not require corroborative evidence of every element of the offense charged. Inasmuch as the Manual provision intends merely to incorporate into military practice the corroboration rule followed by the regular Federal courts, necessarily the *Opper* statement of the rule, and not that of the *Forte* case, must be the one to which military courts should look.

As early as my dissent in United States v Uchihara, supra, I acknowledged that the Manual's procedural statement in this specific area "is binding upon us."[1] But the particular command of the Manual is a command

---

[1] In United States v Villasenor, 6 USCMA 3, 19 CMR 129, I said I doubt "the rule requiring corroboration of a confession is a mere mode of proof." This statement had reference to the basic rule of substantive law that a conviction cannot be had upon a con-

fession alone, and was intended to point up my disagreement with the principal opinion which seemed to indicate that the Manual's statement encompassed only a rule of procedure. As noted in the text above, the Manual's statement on corroboration actually embraces the

only to follow the rule "of common application in the Federal courts." Legal and Legislative Basis, Manual for Courts-Martial, 1951, page 216. That rule was settled by the United States Supreme Court in the *Opper* case. In conformity with the Manual provision, and with the dictate of Article 36, 10 USC § 836, that as far as practicable, the President shall prescribe "rules of evidence generally recognized" in the regular Federal courts, I would follow the Federal rule. See United States v Knudson, 4 USCMA 587, 16 CMR 161.

Although I disagree with the rule followed by the majority, even using that rule, the ineluctable conclusion is that the evidence is sufficient to show the offense charged was *probably* committed.

We begin with the fact that a small child, six or seven years of age, was brought by a woman, who purported to be her mother, to the emergency room of the base hospital about 1:30 or 2:00 in the morning. This circumstance reasonably indicates that something of a sufficiently alarming nature had happened to the child to require immediate medical examination and treatment. We are not told directly what it was that happened to the child, but, in my opinion, the circumstantial evidence points unmistakably to the fact she was the victim of a sexual assault. Inasmuch as circumstantial evidence is sufficient to support a confession, it is patently sufficient to meet the rule requiring independent evidence of the probable commission of the offense charged. United States v Manausa, 12 USCMA 37, 30 CMR 37; United States v Young, 12 USCMA 211, 30 CMR 211.

The child was examined by three doctors. All testified she had bruises on her left cheek which resembled the shape of a human hand. In addition, there was a tear in the perineal area; there "was clotted blood in and around" the genital area; and there was a bruise around the anus. All the doctors agreed the injuries in the perineal area were probably caused by an external force, which one doctor said was "probably blunt in nature." Dr. Burnell testified that the tear in the perineal area was "fresh" and still "moist" at the time of the initial examination. Similarly, Dr. Sweigard described the marks on the child's cheek as "fresh bruise marks." These descriptions of the several bruises strongly indicate they were probably inflicted at the same time. What then of the manner in which these injuries were incurred? Could the tear in the perineal area have come from a fall or some other innocent cause, as defense counsel argued at trial? In my opinion, the evidence shows they probably resulted from a criminal act.

If the cause of the injuries was innocent, is it reasonable to conclude this young child would be rushed to a hospital emergency room in the middle of a winter's night? I think not. The surface injuries were not so serious as to require emergency treatment. Common experience and common sense, therefore, indicate that the hospital visit was probably prompted by the knowledge on the part of the person who brought the child to the emergency room that she had been injured in an incident that was not innocent and not commonplace. What could this incident be?

I referred earlier to the imprint on the child's cheek in the shape of a human hand. The imprint was still clearly observable several hours after the child's initial examination. A blow sufficient to produce such a sharply defined mark for so long a period of time can reasonably be attributed to a conscious and deliberate battery, rather than to accident or some other innocent cause. The "fresh" nature of this mark of violence reasonably connects it to the "fresh" bruises in the genital area and indicates that all injuries were probably inflicted at the same time. And this connection between the injuries explains the emergency nature of the visit to the hospital. All the medical witnesses agreed that the perineal area injuries were compatible with the force-

---

substantive principle and the procedural rule on the quantum of corroboration required. The distinction between the two is ably discussed in the principal opinion in this case. I agree with that discussion.

ful impact of the male organ. The emergency visit to the hospital, the nature of the child's injuries, and the apparent human agency that caused them are, in my opinion, sufficient to support the inference that the child was the victim of a criminal assault by a person intent upon gratifying his lust or desire. Probability of the commission of the offense charged is all the law requires. This probability is amply met by evidence independent of the accused's confession. See United States v Fioco, 10 USCMA 198, 27 CMR 272; United States v Young, supra.

I would answer the certified question in the negative and return the record of trial to the board of review for further proceedings on the merits.