UNITED STATES, Appellee

v

SAMUEL T. BRITTON, Captain, U. S. Army, Appellant

13 USCMA 499, 33 CMR 31

*First Lieutenant Richard O. Skoog* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Ralph Herrod, Captain Thomas Stapleton, Captain Richard A. Baenen,* and *Captain Robert L. Brosio.*

*Captain Peter J. McGinn* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Francis M. Cooper.*

## Opinion of the Court

FERGUSON, Judge:

Captain Samuel T. Britton was tried before a general court-martial convened by the Commanding General, 8th Infantry Division, upon two specifications of cheating in a card game, in violation of Uniform Code of Military Justice, Article 133, 10 USC § 933, and a charge of gambling with an enlisted man, in violation of Code, supra, Article 134, 10 USC § 934. He was found guilty of one specification of cheating, and a charge of gambling with an enlisted man. His sentence extended to dismissal and forfeiture of $350.00 for one month.

The convening authority approved the sentence but deferred application of the forfeiture. The board of review affirmed without opinion, and we granted accused's petition on the issue whether the charge of cheating should have been dismissed by the law officer on the basis that it occurred in a game of chance. See United States v Walter, 8 USCMA 50, 23 CMR 274, and United States v Holt, 7 USCMA 617, 23 CMR 81. We express no opinion on the granted issue but, exercising our inherent authority to notice plain error on the face of the record, pass to the question of the sufficiency of the evidence to establish accused's guilt of cheating.

During the period from December 1960 through May 1961, accused customarily played poker with several officers at the Air Force Officers' Club, Wiesbaden, Germany. Generally, the games involved high stakes and the hands were played according to "dealer's choice." In March 1961, accused and a Lieutenant Sanders were the only remaining participants in a hand of "Congo which is a version of seven-card stud." Another player, Major Stallings, glanced at the undealt cards, the discards in the center of the table, recalled the number of cards dealt each person, and mentally calculated that the deck was inexplicably two cards short. He announced that "the deck was short" and, although play had ended, asked Sanders and Britton to hold their cards. Sanders dropped or threw his hand into the discard pile and Britton followed suit. As Britton threw his hand in, Stallings observed them and counted two extra cards. No further count was possible because of the general intermingling of hands and discards. As no one else had noticed "what I had seen," Stallings made no "direct accusation" and continued to play poker with accused, Sanders, and the others.

The foregoing evidence constituted the sole basis for the specification of cheating of which accused was understandably acquitted. As Stallings' suspicions were later communicated to Lieutenant Sanders, this evidence nevertheless casts light on the latter's testimony in connection with the charge now before us.

In May 1961, another of the series of poker games occurred at the Officers' Club. Participating were the accused, Major Heiser, Major Fredricks, Lieutenant Sanders, Captain Armstrong, Captain Mallette, and a Mr. Nelson. After a few hands were played, Major Heiser became dealer. As he shuffled

the cards, "it just felt like I didn't have them all." Heiser announced the fact that the deck was short and asked that all cards be thrown in. No more cards turned up, and it was suggested that the deck be counted. The tabulation revealed two cards were missing.

Lieutenant Sanders was suspicious of Captain Britton because of the earlier incident involving Major Stallings. As soon as it had been determined there was a shortage of cards, he began to watch the accused closely. He observed him pull his left hand from between his legs and place it in his left front pants pocket. When accused withdrew his hand, Sanders called upon everyone to empty their pockets on the table. Captain Britton stood up with the others and put his hands in his trouser pockets and removed various items. According to Sanders' testimony:

> "Then he pulled some things from out of his right rear pocket then, if he had anything pulled some things from his left rear pocket. Then he went back to his left front pocket with his left hand and pulled out something and run [sic] it up behind his back, like this, and hesitated a moment and brought his hand down again, then he put his hand into his right rear pocket and came up. While he was back there he took his right— he took something from behind his belt and was about to slip it into his right rear pocket when I grabbed his wrist."

When his wrist was grabbed, Britton "clenched his hand and there was a crunching sound." "It didn't sound like paper, it sounded like cardboard." Accused freed himself and was told to leave his money on the table until the matter could be settled. Accused nevertheless attempted to gather his funds, and Sanders seized them.

A scuffle ensued, with the parties finally being separated after Nelson went to Sanders' assistance. Accused then grabbed Sanders' money from the table. Finally, it was agreed that the two sums would be exchanged by their respective owners, and comparative peace was restored.

Accused started to leave the card room and was immediately followed by Sanders and Nelson, the former yelling for him to stop. Accused whirled and told Sanders not to come any further or " 'I will gut you.' " At that time, he had something shiny "sticking out about a half of an inch" from his right hand. Sanders and Nelson stopped. Britton then left the room and the others returned to the table.

The two missing cards were never found. Neither Sanders nor any other witness actually saw them in accused's possession at any time, nor could they state the nature of the "something" which accused allegedly had transferred to a rear pocket.

A short time later, accused returned to the room. According to Sanders, "he said, 'If I promice [sic] not to do anything like that again would you let me play', and we all said no." Mr. Nelson testified that accused said "in words or substance, 'Can I continue to play if I don't cheat'?" Britton then spoke with Major Heiser in private and declared:

> ". . . 'Major, I know what I have done is unforgivable,' words to that effect, that he knew what he had done was unforgivable, but, however, he said, 'You know, my wife has gone home to the States and she's living with some relatives,' and he was in financial difficulties."

Heiser suggested that the players "might overlook it" if accused left his money on the table and departed. Accused agreed to this, but when Heiser put the question to the others in the group, they refused to remain quiet about the incident. Accused then spoke with Lieutenant Sanders privately and told him, " 'You know that I am not a good enough player to be able to maintain my status in this game without doing something that will give me an advantage, and therefore I had to do something like this.' " Sanders replied that "we couldn't condone any sort of cheating . . . in our poker game."

The game was ended and, as Sanders went to his car in the parking lot, Britton approached him once more. He asked Sanders not to report the inci-

dent, as it would "ruin" him. Sanders replied that he was sorry but felt that "something should be done."

Sanders admitted that he and Nelson later approached accused and offered to forget the matter in return for a payment of $500.00. However, he realized on the "very same day" that the proposal was a mistake. Subsequently, he refused to accept the sum from accused.

For the defense, Captain Mallette testified that he participated in the game and at no time did he hear accused say he had cheated. Having known Captain Britton for approximately four years, he considered him to be a fine officer and was not aware of any financial difficulties in which he was enmeshed. Other character witnesses attested to Britton's outstanding background in like manner.

Testifying in his own behalf, accused unequivocally denied he had engaged in cheating the other players; declared that the fight with Sanders had erupted over the lieutenant's sudden seizure of his money from the table; and denied he had ever admitted his guilt to the other players. He explained that they had misunderstood what was intended to be no more than an apology for his unseemly brawling with Sanders.

In measuring the sufficiency of the evidence to sustain the findings of guilty as a matter of law, we must view the proof from the standpoint most favorable to the Government. United States v Brand, 10 USCMA 437, 28 CMR 3; United States v O'Neal, 1 USCMA 138, 2 CMR 44. And if it is permissible to consider accused's voluntary statements on the night of the incident, it is apparent that his guilt is not open to question. They establish beyond cavil that he sought dishonorably to cheat his fellow players, in violation of Code, supra, Article 133. But such statements, lacking the necessary corroboration, may not serve as the predicate for findings of guilty. United States v Smith, 13 USCMA 105, 32 CMR 105. As we said in United States v Young, 12 USCMA 211, 30 CMR 211, at page 213:

"It is settled military law that, in order to sustain findings of guilty, an accused's confession must be corroborated by substantial, independent evidence tending to establish the existence of each element of the offense charged."

Is there such evidence in this case, *aliunde* the accused's statements? We think not. Careful examination of the entire record discloses that only two real facts are established by the testimony of the various witnesses. They are the shortage of two cards in the deck when it was passed to Major Heiser as the new dealer and accused's hand movements. While we frankly question the ability of any card player to detect the loss of only two cards by hefting the deck, the accuracy of Heiser's observation was established by counting. Beyond this, however, the declarations of the witnesses amount to no more than conclusory accusations and surmise concerning what Lieutenant Sanders deemed suspicious behavior on Captain Britton's part. Such suspicion and belief may serve these officers as an adequate reason for denying the accused the privilege of further association with them, but it hardly reaches the level of the necessary "substantial, independent evidence" of cheating at cards. United States v Smith, supra; United States v Young, supra.

Undoubtedly, as Sanders testified, the shortage was viewed by him in light of Major Stallings' earlier comments concerning accused's alleged behavior in another game. Bearing these suspicions in mind, Sanders was able only to state that accused drew his hands from between his knees and placed one of them in his left trousers pocket. After all players, including the accused, began to empty their pockets on the table, Sanders further asserted that accused transferred "something" from his left pocket to behind his belt and thence to his rear pocket. Significantly, however, the Lieutenant was unable to state the nature of this "something." Indeed, he admitted that he never actually observed anything in accused's hands.[1]

[1] It is not without significance, we believe, that Sanders' testimony in this re-

The unseemly struggle between Britton, Sanders and Nelson was productive of no circumstance tending to establish the former's guilt, nor is his leaving the room after having thus been attacked.

Summed up, then, the corroboration of accused's statements, each version of which seems to vary according to the particular witness testifying, amounts only to the shortage of two cards plus movements of the accused's hands to and from various pockets. No cards were found in the room and, in fact, there is simply nothing to show that anyone, with intent to defraud, withheld cards from the deck when the deal passed to Major Heiser. At most, accused's initial hand movements might arouse suspicion on the part of the other players. Their subsequent use in connection with the contents of his pockets can most reasonably be interpreted as no more than compliance with Sanders' suggestion that all pockets be emptied on the table. But even if these movements also be considered as indicative of untoward conduct in the poker game, they too arouse no more than a suspicion that cards were being held out. Certainly, we are not able to conclude they are a substantial indication of the probability that someone was cheating at cards. And, as the record is devoid of other evidence tending to establish the offense—aside, of course, from accused's statements—we must necessarily conclude that the proof of guilt is insufficient in law. United States v Smith, supra, at page 120.

The findings of guilty of Charge I and its remaining specification are set aside. The record of trial is returned to The Judge Advocate General of the Army. A rehearing on the sentence is directed.

Chief Judge QUINN concurs.

KILDAY, Judge (concurring):

I concur.

In every criminal case the burden is upon the Government to establish the *corpus delicti,* and to establish it beyond a reasonable doubt. United States v Smith, 13 USCMA 105, 32 CMR 105. A court may not consider the confession or admission of an accused as evidence against him unless there is other evidence in the record that the offense had probably been committed by someone. Paragraph 140*a*, Manual for Courts-Martial, United States, 1951; United States v Smith, supra.

Of course, the nature of the burden of proof differs. In the latter case the evidence need show no more than probability, while in the first instance mentioned the *corpus delicti* must be proven beyond a reasonable doubt. I concur in the holding that appellant's statements were improperly admitted in evidence because of the lack of evidence in the record to show that the offense had probably been committed by somebody. However, I entertain serious doubt that this record contains any creditable evidence which could be construed as proof, beyond a reasonable doubt, that the offense was committed.

It is necessary to develop the evidence more fully in order to exemplify both issues.

Initially, it should be observed that the offenses are alleged to have been committed "at Wiesbaden Air Force Base Officers Club." The proof corresponds with the allegation as to the situs of the transactions. However, from this it cannot be assumed that the poker game was, or was intended to be, one between "officers and gentlemen." Without any reasonable dispute, the record reflects that the game was between a wholly nondescript group. The composition, at various times, ranged from an American former serviceman, then an expatriate residing in Germany, through sergeants of the United States Army to colonels, lieutenant colonels,

gard was impeached by evidence that he had, under oath in the pretrial investigation, declared that accused's fingers were pried apart during their struggle, disclosing the cards. We note also, with some amazement, that this officer admitted without cavil his attempt to extort $500.00 from the accused in return for quashing the accusation against him. While these considerations bear not upon legal sufficiency, they are worthy of note in view of the conclusory nature of the witness' testimony concerning Britton's behavior.

503

majors, captains, and lieutenants of both the United States Army and Air Force, and a civilian employee of the Air Force of the grade GS–9, later a GS–11. The prosecution showed that the expatriate "describes himself as a professional gambler." The prosecution also showed that he resided, at the time of trial, at the "Mainz County Jail." The law officer sustained a defense objection to the last question and instructed the court-martial in the following language: "The court will disregard the reference to the association with Wooten [the expatriate] and the fact that he might now be in the Mainz County Jail." The instruction contained nothing as to disregarding the statement, "describes himself as a professional gambler."

In this game the pots ran from $50.00, $100.00, an occasional pot I would say up to $300.00. On rare occasions we'd have pots of $500.00. I have heard of pots exceeding $500.00." "On rare occasions, very rare occasions, the pots could reach a thousand dollars, but that would be the rare occasion." There is a clear implication that the investigation of poker games at Wiesbaden Air Force Base Officers' Club was, at least partially, triggered by resentment which arose when one Sergeant First Class Roosevelt Glass, United States Army, a negro, won an especially large pot at the above-mentioned Air Force Officers' Club.

Unless I have been grossly misled, or am totally naive, neither colonels, lieutenant colonels, majors, captains, lieutenants, or civil service employees of the grades of GS–9 or GS–11, are in an income bracket permitting wagers of this level. Civilians will never understand the military logic which sustains the dismissal of appellant, a captain, for gambling with a first sergeant, while condoning gambling between field grade officers and lieutenants. The effect upon discipline seems virtually identical. The evidence is clear that this was not a friendly, gentlemanly game of innocent penny-ante poker, but a game for high stakes. There was little or no inquiry as to the military status of the participants. All with $100.00 seem to have been welcome.

504

The occasion for these offense was afforded by Air Force approval or condonation of such a game. The major in charge of the Wiesbaden Air Force Officers' Club was an actual participant in the game out of which the offense before us arises. The major was not a witness in this case, having conveniently retired and returned to the United States. At the time of trial he was stated to be employed as manager of an Air Force Officers' Club in the United States.

This record indicates that regular participants in this weekly poker game were on the constant alert for evidence of cheating. A number of incidents are referred to and others are detailed. There are two occasions upon which one of the participants testified he had suspected cheating but none of the other participants concurred. It is made clear that possible cheating was accepted as one of the risks assumed upon entering this game.

It is of prime importance to examine testimony which was produced before the court-martial on a specification alleging that the appellant cheated at poker in the same club on an earlier occasion, and of which the appellant was found not guilty. The evidence, with reference to the earlier incident, shows that Major Stallings suspected both appellant and Lieutenant Sanders of cheating by collaboration between them. Lieutenant Sanders testified that he knew of the suspicion which had fallen upon him in connection with that incident. Ironically, the evidence offered on the specification of which appellant was acquitted was equally incriminating as to both Sanders and appellant. Appellant appeared as the accused and Sanders as the principal witness against him.

In addition to the deviations between the testimony at the trial and testimony at the Article 32 hearing, pointed out in the principal opinion, there are other conflicts. Among others, in his original testimony, Nelson stated, unequivocally, that appellant, when attempting to re-enter the game, used the word "cheat" in describing his previous conduct. When recalled at the request of

a court member, and in answer to questions by the law officer, testified as follows:

"Q: That is important. Did he say, 'if I don't cheat,' or—

"A: I am not certain of the exact words."

The exact words were of paramount importance, and Major Heiser, to whom accused made his statement, never quoted appellant as having used the word "cheat."

The witnesses varied in their versions of the content of the statement made by appellant when attempting to re-enter the game. All of the versions are subject to different constructions, some constructions would render them incriminating and others not.

We now come to a consideration of whether the evidence in the record is sufficient to show that the offense had probably been committed by somebody. The uncontroverted evidence shows that Lieutenant Sanders procured the cards used in the game and brought them to the club. There is no evidence that any participant, other than Sanders, had access to the cards prior to the game. There is no evidence that the deck was counted when it was introduced into the game. While a participant in other games testified that a sealed deck was used in other games of the group, there is no evidence this deck was sealed. And even though poker players might regard a seal on a deck of cards as sufficient to denote that the content is full and correct, we doubt the efficacy of a seal to import guilt of a criminal offense. True the missing cards were not found in the room, but there is no evidence they were ever in the room. These omissions leave nothing but speculation and suspicion that the offense had probably been committed by somebody and there is a total lack of evidence to that effect.

Practically all of the incriminating evidence implicating appellant was given by Lieutenant Sanders. Lieutenant Sanders knew he had been previously suspected of cheating. When the question of the shortage of two cards was raised, Lieutenant Sanders acted "simultaneously" in his accusations of appellant. Lieutenant Sanders was the junior officer present. Notwithstanding, he immediately gave orders to his superior officers to stand up and empty their pockets. And Sanders, a lieutenant, grabbed appellant, a captain, by the wrist and grabbed appellant's money from the table. He, with the aid of the GS-9 (or GS-11) civilian employee, engaged in an unseemly brawl with appellant, during which all three fell to the floor. We should not overlook the fact that Sanders admitted his attempt, along with Nelson, to extort $500.00 from appellant as his price for failing to report the incident. True, Sanders attempted to pass this off as a "mistake of judgment." However, the extortion attempt was two days after the incident, permitting adequate opportunity for reflection. At an earlier time Sanders had insisted the money was not important as a principle was involved.

This was a court-martial by the Army of an Army captain for conduct alleged to have occurred in an Air Force Club and affecting Air Force officers. It seems strange that Lieutenant Sanders should have been assigned to Morocco for temporary duty on November 16th, and this court-martial convened on November 30th. The urgency of such an assignment of a junior officer assigned to "USAF Passenger Reservation Service" is not perceived. I commend the law officer for his perspicacity in rejecting Sanders' deposition and continuing the trial for three weeks to secure his appearance in person.

We have no alternative but to reverse the action of the board of review on this specification and to direct that the same be dismissed. Article 67(e), Uniform Code of Military Justice, 10 USC § 867.