## UNITED STATES, Appellee
v
## JACK LEROY PARHAM, Private First Class, U. S. Army, Appellant

14 USCMA 161, 33 CMR 373

No. 16,776

July 26, 1963

*First Lieutenant James J. McGowan* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk, Lieutenant Colonel Ralph Herrod, Captain Charles W. Schiesser,* and *First Lieutenant Richard O. Skoog.*

*First Lieutenant Robert T. Webster* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Francis M. Cooper.*

## Opinion of the Court

FERGUSON, Judge:

Tried before a general court-martial convened at Kaiserslautern, Germany, by the Commanding General, Northern Area Command, the accused was found guilty of robbery and sodomy in violation, respectively, of Uniform Code of Military Justice, Articles 122 and 125, 10 USC §§ 922, 925. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for four years, and reduction. The convening authority reduced the period of confinement involved to one year, but otherwise approved the penalty. With appellate counsel asserting only that the approved sentence was inappropriate, the board of review affirmed. Accused's petition for review before this Court, however, alleged that the evidence was insufficient in law to support the findings of guilty, and we granted on the assignment thus urged.[1]

The evidence presented to the court-martial tends to establish that the alleged victim, one Pirmin Mueller, sought, between 9:00 p. m. and 10:00 p. m. on August 6, 1962, a homosexual contact with an American soldier at Muenchweiler, Germany. Apparently, he succeeded only too well, for, according to Mueller, the American proved receptive to his advances, engaged in an act of anal sodomy with him, assaulted him, and removed approximately fourteen marks from his person. There is also evidence tending to establish that Mueller shouted for help; that one Buettner came to his assistance; and that aid was thereafter sought from the military guard at the gate to a nearby Army compound. Buettner did not see Mueller's assailant, as the latter fled before he arrived on the scene, and the victim did not disclose the act of sodomy until he was later questioned by German police to whom the incident had been .duly reported.

The question of sufficiency before us involves only whether the evidence satisfactorily establishes the identity of the accused as the perpetrator of the crimes. That there may be no doubt of its nature, we set out Mueller's testimony regarding this essential aspect of the case:

"Q. Was there sufficient light for you to see the person and form an impression of his features?

"A. Yes, there was sufficient light. It was not too well illuminated in this area, but there was enough light so that you could see the man and recognize him.

"Q. Would you be able to recognize the person concerning whom you have testified again?

"A. I believe so.

"Q. If that person is here in court, would you point to him, please?

"A. Most likely this person. (Witness indicated accused by pointing.)

. . . . . .

"Q. Are you sure in your own mind that the person you pointed at here is the person you had contact with that evening?

"A. Yes, I am; however, a man

[1] The record before us does not disclose the reasons for the failure of counsel to seek relief at the intermediate appellate level, and we intend no criticism in pointing it out. Nor is such action a prerequisite for review in this Court. Considerations of sound administration of justice, however, argue in favor of seeking relief at the lowest possible level in order to insure prompt resolution of error and eliminate unnecessary delay in the final disposition of the cause.

could be mistaken, so I would not say that, for sure; I wouldn't be a hundred per cent [sic] sure.

"Q. Does this person look the same in every characteristic as the person whom you have testified concerning?

"A. Well, I mean to say, exactly as the features of that man was, I would say this would be the man in question, but as I said, you could be mistaken about something, and I just wouldn't swear to it.

. . . . . .

"Q. Can you remember any conversation other than that of which you've testified that the person told you when you were sitting on the bench?

"A. Well, he also told me that he had been in Germany for approximately two years and that he likes it over here. And I also asked him for his name and he said something like 'Larry' or 'Laurie', but he didn't tell me whether this was his first or his last name.

. . . . . .

"CROSS EXAMINATION

. . . . .

"Q. Pirmin Mueller, would you look at the accused?

"A. Yes. (Witness looked directly at the accused.)

"Q. Now, you testified before that during the time all this was going on you had a good look at your assailant or your partner in this act of sodomy. Now, will you tell the court that this is absolutely the man that did it?

"A. I cannot really maintain that; that is, I cannot be a hundred per cent [sic] sure; I actually do not have many doubts that this is the man, after I saw him again in the line-up.

"Q. You would swear that this is the man who was your partner on the night of 6 August?

"A. No, I would not.

. . . . . .

"Q. You are attempting to hide or conceal the identity of your real partner in this homosexual act, are you not? The man that you were going to meet at the gate was your partner in this sexual act, and you're

trying to hide and conceal his name from the court, isn't that true?

"A. No, I don't want to protect him, but I don't want to get him into something if I don't know really that it was the man, that he will get punished for something that he didn't do.

. . . . . .

"Q. Pirmin Mueller, you saw your assailant on the night of 6 August; you spent considerable time with him from the time you met him at the gate, went into the woods, had this sexual intercourse, indulged in a fight, and all of this—isn't that correct? And, then, the very next day you saw him, or saw a man again, whom you picked out of a line-up—isn't that true?

"A. Well, what do you mean, I just pick out a man in the line-up? I picked this man out because he was close to the assailant by his figure; and as I was just standing in front of him, he turned pale, or he turned white, and he was shaking, so I thought this is also an indication that he was afraid I would recognize him; and, of course, it could also be possible that a man could be nervous in a line-up if just anyone stands in front of them, but the possibility also is that the assailant is not even in the line-up.

"Q. Pirmin Mueller, you had ample occasion to get a look at the face, figure of your partner in this sexual act on 6 August, and subsequent to that time you had ample opportunity to see, to view, the accused in this case, Pfc Parham. Now, I want you to look at this man again, closely, and tell the court that you would swear that that's the man who assailed you on the night in question, 6 August.

"A. I cannot do that. I cannot swear. I'm not fully convinced of it.

. . . . . .

"REDIRECT EXAMINATION

"Questions by the prosecution:

"Q. What does the word 'swear' mean to you?

"A. To swear means to tell the full truth.

**163**

"Q. Now, when you say that you cannot swear that this was the man, do you mean that it's possible that he could have a twin brother that could appear exactly the same?

"A. No, it's not that. I am not fully convinced that he was the man. It could have been someone else; as well as this man, it could have been just any other man, and I don't want to get—to accuse this man if it was someone else.

"Q. You have previously testified that you identified this man the day after in a line-up, is that correct?

"A. This is true. I told the police at the same time that I strongly believed that this was the man, but I cannot fully maintain this because I have no sufficient proof of this.

• • • • • •

"EXAMINATION BY THE LAW OFFICER

• • • • • •

"Q. Did you positively identify your assailant at the line-up, the day after these incidents occurred?

"A. Well, what do you mean 'identify'? This was the person who was most likely the one.

"Q. Did the same doubt exist in your mind at the time that you identified the accused at the line-up as exists in your mind today?

"A. Yes, I believed he was the man in question, but I was not fully convinced that he was.

• • • • • •

"EXAMINATION BY THE COURT

• • • • • •

"Q. What were the lighting conditions of the road where you met the three people?

"A. Sufficient.

"Q. Was the third man that he [Mueller] saw the enlisted man sitting at this table?

"A. Well, that's what I don't know for sure.

"Q. Herr Mueller, have you had any conversation since the 6th of August, other than a routine investigation, with any American personnel?

"A. Well, it depends how you mean it. I have talked to Americans who came to me downtown, but especially with this person I have not. But I have not talked about this particular subject; nobody asked me and I didn't tell anyone about it.

"Q. Did any of the Americans speaking to you threaten you in any way to do bodily harm to you if you identified this person at this or any other hearing?

"A. No, there was no threats, nothing."

There was also evidence that Mueller on August 7, 1963, "identified" the accused as his assailant in a line-up held at his barracks.

The standard by which we measure the sufficiency of the evidence to sustain findings of guilty is, as we have many times declared, one of law. United States v Britton, 13 USCMA 499, 33 CMR 31; United States v Brand, 10 USCMA 437, 28 CMR 3; United States v O'Neal, 1 USCMA 138, 2 CMR 44. In performing our allotted task, "we must view the proof from the standpoint most favorable to the Government," United States v Britton, supra, at page 502, and determine whether "there is any substantial evidence in the record to support a conviction." United States v McCrary, 1 USCMA 1, 3, 1 CMR 1, 3.

We may put to one side Mueller's identification of the accused at the line-up.[2] As the Manual for Courts-Martial, United States, 1951, quite clearly points out, such evidence is admissible only if "a witness *testifies as to the identity of the accused* as the person who committed, or did not commit, the offense in question." (Emphasis supplied.) Manual, supra, paragraph 153a; United States v Armstrong, 4

[2] We note, in fact, that, according to Mueller's testimony, there was no real identification at the line-up. At most, there was a crystallization of his suspicions and the formation of an opinion based upon accused's purported resemblance to his assailant and the reaction to Mueller's scrutiny.

USCMA 248, 15 CMR 248; United States v Burke, 76 BR 1; United States v Catubig, 74 BR 179; United States v Wolford, 67 BR 233; United States v Hayes, 65 BR 373; United States v Shirley, 45 BR 351.

The Government's case, therefore, must stand or fall on Mueller's testimony. And fall it must, ■ for he resolutely refused to swear that the accused was the individual who engaged in the act of sodomy with him and thereafter robbed him. Indeed, upon oral argument, the Government effectively conceded this point, for it admitted that, assuming the falsity of his testimony regarding identification, Mueller could not be convicted of perjury. In short, he simply did not take an oath to recognition of Parham as the offender. There is, therefore, no "testimony" in the record connecting him with the crimes charged. Cf. Code, supra, Article 42, 10 USC § 842; United States v Slozes, 1 USCMA 47, 1 CMR 47.

Military appellate authorities have heretofore pointed out that, "In foreign lands the question of identity is always of paramount importance and the similarity of the apparel of soldiers renders identity more difficult." United States v Hayes, supra, at page 388. Here, however, the perpetrator of the offense was clad in civilian clothing, and the victim maintained that there was sufficient light to be able to recognize the person involved. He declared without contradiction that he had not been approached by anyone concerning the case and tellingly depicted his perception of the meaning of an oath as being "to tell the full truth." He rejected the sugges-tion of counsel that his refusal to name the accused as the guilty party was based upon the possibility that he "could have a twin brother," and reiterated time and again that he was "not fully convinced." As we read the record, the sum and substance of the testimony is conveyed by his answer:

"No, it's not that. I'm not fully convinced that he was the man. It could have been someone else; as well as this man, it could have been just any other man, and I don't want to get—to accuse this man if it was someone else."

It is with such "evidence" that the path of injustice is paved. This is not a case in which an honest and cautious witness refused to accord absolute certainty to his identification, see Davis v United States, 78 F2d 501 (CA 10th Cir) (1935), but one in which the witness' declarations establish such grave reservations and doubts that he would not, upon his oath, declare Parham to be the guilty party. Absent at least a willingness to point the accusing finger under the sanctions imposed by that jurat, we conclude there is no foundation upon which the findings of guilty may be rested. United States v O'Neal, supra; United States v Burke, supra. The evidence is, therefore, insufficient in law.

The decision of the board of review is reversed and the record of trial is returned to The Judge Advocate General of the Army. The charges are ordered dismissed.

Chief Judge QUINN and Judge KILDAY concur.