UNITED STATES, Appellee

v

DAVID L. KISNER, Sergeant, U. S. Army, Appellant

15 USCMA 153, 35 CMR 125

■■■■■■■■■■■ ■■■■■■■■■■■■

*Captain Robert T. Webster* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk, Major George O. Taylor, Jr.,* and *Captain Charles W. Schiesser.*

*Captain William L. Leonard* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Francis M. Cooper* and *Captain Charles M. Pallesen, Jr.*

## Opinion of the Court

FERGUSON, Judge:

Tried by general court-martial convened at Fort Sheridan, Illinois, by the Commanding General, Fifth United States Army, the accused was found guilty of malingering, in violation of Uniform Code of Military Justice, Article 115, 10 USC § 915. He was sentenced to bad-conduct discharge, forfeiture of all pay and allowances, confinement at hard labor for four months, and reduction. The convening authority approved the sentence. The board of review affirmed the findings of guilty, but commuted the punishment approved below to confinement at hard labor for nine months and forfeiture of $70.00 per month for nine months. We granted accused's petition for review upon the assigned issue whether:

"THERE WAS INSUFFICIENT EVIDENCE, ALIUNDE THE CONFESSION, THAT THE OFFENSE CHARGED WAS PROBABLY COMMITTED. THIS LACK OF A CORPUS DELICTI RENDERS ACCUSED'S CONFESSION INADMISSIBLE REQUIRING A REVERSAL."

The specification of the charge alleges that the accused "for the purpose of avoiding overseas duty intentionally injure[d] himself by shooting himself in the foot." The evidence indicates that, on January 12, 1963, Kisner's unit was alerted that he was to be transferred to Korea in April 1963. This information was passed to Kisner. However, his unit asked that he be deferred from overseas shipment for sixty days in light of the fact that he was "scheduled to report to the U. S. Army Hospital, Fort Benjamin Harri-son, Indiana on 8 April 1963 for surgery 9 Apr 1963 to correct abdominal hernia." The deferment was approved on February 6, 1963, and issuance of appropriate amendatory orders was directed. Accused's date of availability for transfer was thus extended to June 19, 1963. Prior to this day, however, accused's father became critically ill, and another deferment was authorized. Special orders were again issued, changing accused's availability date to September 18, 1963.

Accused continued to perform his normal duties during the week preceding his scheduled departure. By September 13, 1963, he had almost completed routine clearance of his post and had made arrangements to depart by commercial airline on the afternoon of September 16 in order to report for overseas air transportation at Travis Air Force Base, California, by September 17, as ordered.

On Sunday, September 15, 1963, accused visited his parents at North Salem, Indiana, near his duty station. While there, he "decided to go down to the pond with his rifle and he came up to the house and . . . decided to take the gun home and clean it." The weapon in question was a .22 caliber Remington Scoremaster, which accused had bought for his father some years previously. Kisner used it frequently to "kill groundhogs and rats down at the pond." He was, according to his father, a "fairly successful hunter" and familiar "with the use of rifles generally," having been using them "off and on" all his life,

On the morning of September 16, 1963, the day of his scheduled departure for overseas duty, accused returned to his father's home "and said he had had an accident." His parents called an ambulance. After the ambulance departed, accused's father removed the rifle from the rear seat of accused's car and placed it in his house.

Accused was initially treated for a wound in his foot by Dr. Robert Kirtley, a civilian physician. It was stipulated by the parties that, if present, Dr. Kirtley would testify, in his expert opinion, that the wound could have been inflicted either intentionally or accidentally but, based on "the absence of powder burns in the area of the wound . . . , I would say it is more likely that it was accidentally inflicted." Kisner was also treated at the U. S. Army Hospital, Fort Benjamin Harrison, Indiana, on the same day. There, he was found to be suffering from an "injury to the third and fourth toes." Dr. Waters, the attending physician, described accused's condition as follows:

". . . On the third toe there was an abrasion and on the lateral side of the distal portion of the toe the fourth toe had been struck and injured with a wound of entry and exit in the distal portion of the fourth toe."

The injury "was such that it was similar to one which could have been created by a missile or a bullet." With the ball of the foot placed firmly on the ground, the angle "in which the missile would have entered the foot . . . was approximately about 45 to 60 degrees from the horizontal."

Sergeant Kisner was admitted to the hospital on the same day. The date of his discharge therefrom is not shown on the record, nor is there any testimony as to the extent of disability caused by the injury to his foot. The nature of the wound was routinely reported to military police, and, on September 23, accused was interviewed by Chief Warrant Officer Bowles of the Criminal Investigations Detachment. After proper advice concerning his rights under Code, supra, Article 31, 10 USC § 831, he voluntarily executed a statement in which he declared that he had accidentally shot himself in the foot while attempting to re-enter his automobile after unsuccessfully trying to kill a groundhog.

On October 2, 1963, at Chief Warrant Officer Bowles' request and again after proper warning, accused drove investigators to the alleged scene of the incident, pointed out relevant features, and reenacted the shooting for their benefit. The rifle, according to Chief Warrant Officer Bowles, was "exceptionally long . . . , and it was necessary for Sergeant Kisner to hold the rifle up and manipulate his left foot around a little bit to get a position which would approximate a position that his foot would have been in to get the wound that he had suffered."

Dissatisfied, Mr. Bowles again interviewed the accused on October 3, 1963, after proper warning. He informed accused that his investigation led him to believe that "he was having some [marital] difficulties due to the fact that he was on orders to go to Korea . . . [and] I told him that I was going to tell him what I believed had happened." After Bowles recounted his belief that accused had intentionally shot himself, accused said, "Yes, that's right." Thereafter, accused made an oral statement, subsequently reduced to writing, in which he confessed that, because of marital difficulties engendered by his choice of military service as a career, he had deliberately shot himself in the foot in order to avoid shipment to Korea.

It is settled law that an accused's confession may be considered as proof of guilt only if it is corroborated by substantial independent evidence tending to establish the probable occurrence of each element of the offense charged against him. United States v Britton, 13 USCMA 499, 33 CMR 31; United States v Smith, 13 USCMA 105, 32 CMR 105; Manual for Courts-Martial, United States, 1951, paragraph 140a. The matter was extensively considered and the authorities collected and ably discussed for the Court by Judge Kilday in United States v Smith, supra. Neither the Government nor the ac-

cused contend for an application of a new or different standard to the evidence here presented, but argue whether the proof meets the measure to which we have heretofore so consistently adhered.

Proof of the offense of malingering, in the context of the case before us, required some evidence to ■■■■■■■ be produced that the accused had been ordered overseas for duty; that he knew of such orders; and, in order to avoid complying with them, he intentionally inflicted upon himself a gunshot wound in the foot. United States v Yarborough, 1 USCMA 678, 5 CMR 106; United States v Pedersen, 2 USCMA 263, 8 CMR 63. The essence of the question presented is whether the shooting was shown probably to be deliberate rather than accidental.

In the *Pedersen case,* as here, there were no witnesses to the alleged deliberate self-injury other than the accused. There, the accused was found in his barracks with a bullet hole in his left foot caused by a discharge of his own rifle. Accused testified that the shooting was accidental and he did not know the weapon was loaded. We reversed because of the use of an inadmissible pretrial statement to impeach the accused's testimony. However, we also dismissed the charges on the basis that the evidence was insufficient to establish accused's guilt of malingering, the Chief Judge declaring, at page 266:

"We need not decide whether the prior inconsistent statements, offered by trial counsel for impeachment purposes only, could, if legally obtained, be considered as substantive evidence bearing on guilt or innocence. They were, in any event, improperly received in evidence. Without these statements impeaching the veracity of the accused's denials of the offense, *there remains in the record no proof that the accused deliberately shot himself. As already noted, there were no witnesses to the shooting.* Since the record offers no suggestion that there is available any admissible substitute for the evidence we hold inadmissible, . . . the charge and

specification must be dismissed for want of sufficient evidence." [Emphasis supplied.]

Here, too, as noted above, there were no witnesses to the injury suffered by the accused. Aside from ■■■■■■ his statements, there is proof that he was properly ordered to Korea, that he was well aware of such orders, and that, on the day he was to comply therewith by commencing his journey westward, he suffered an injury to his foot, probably as the result of a bullet wound. But the record is devoid of the slightest suggestion, independent of his confession, that he deliberately inflicted the injury upon himself. United States v Pedersen, supra.

The Government urges the probability of such deliberate self-injury is shown by the fact that it occurred on the day of his scheduled departure; the unusual length of the rifle; and, finally, that the wound itself combined "maximum disability with a minimum amount of permanent damage." It also contends that accused's awkward reenactment of the alleged accident and his "false exculpatory statements" are relevant to corroborate his statement that the wound was intentionally inflicted. We disagree.

First, unlike the Government, we attribute no significance to the fact that the injury occurred ■■■■■■ on the day of accused's intended departure for Korean service, particularly in light of the evidence that he had made the necessary arrangements to comply with his orders. One may suffer an accidental injury on the verge of his departure for overseas as easily and reasonably as months or days before. Taken alone, or in conjunction with the other proof, the factor of time simply has no importance here. It is of the same caliber as the contention, also advanced by the United States, that it was "unusual for a person who knows he is going to be away from his family for more than a year" to go hunting on the eve of his departure. The argument smacks of one who has never known the joys of September in the

open, the drumming of partridge, the whirring of quail's wings, or even, as here, the more prosaic joy of sniping at muskrats and groundhogs near a farm pond. That there is nothing out of the ordinary in playing Nimrod at such a time is well recognized, at least, we are certain, by thousands of hunters' wives.

So also do we find nothing of importance proved by the length of the weapon and the implication ██ of Chief Warrant Officer Bowles' testimony that it would have been awkward for the accused to have shot himself in the manner in which he reenacted the incident. Aside from the governing consideration that such reenactment constituted in itself a statement of the accused which requires corroboration, see United States v Taylor, 5 USCMA 178, 17 CMR 178, and United States v Bennett, 7 USCMA 97, 21 CMR 223, Bowles' conclusion that accused, because of the length of the weapon, had to assume an awkward position in order to demonstrate what happened does not indicate a probability that he shot himself deliberately. We dare say, with regard to this assertion, that more hunters than not are shot accidentally simply because they got themselves into an awkward position with their firearm. Be that as it may, the Government may not rely upon the reenactment as a corroborating factor, as it amounts to no more than an attempt to use one statement by the accused to reinforce another. United States v Taylor, supra; United States v Villasenor, 6 USCMA 3, 19 CMR 129; Manual, supra, paragraph 140a.

The same is true with respect to accused's allegedly "false exculpatory statements." The whole point of requiring corroboration of an accused's out-of-court statement is to insure, by *independent* evidence, that the accused is not convicted solely out of his own mouth. As Judge Kilday noted, in United States v Smith, supra, at page 112:

"It is this writer's view that the rule that no person shall be convicted of crime upon his confession unless and until the same is corroborated is

a sound principle of law; it is a valuable right of the accused and a great protection to him. Proof of the *corpus delicti* is fundamental in every criminal prosecution, and its existence must be shown, just as all other elements; that is, by legal and competent evidence."

The essentiality of this protection for an accused is compellingly demonstrated by the Government's argument here. Faced with too wholly inconsistent versions of the incident by Sergeant Kisner, one of which asserts that the shooting was accidental and the other confessing it was purposeful, it arbitrarily assigns the character of falsehood to that which is inconsistent with his guilt and argues this "falsehood" serves to corroborate the statement which tends to support Kisner's guilt. The contention, we fear, overlooks an essential point, *i.e.*, any proof that accused's initial version was probably false, something which we find sadly lacking here. Cf. United States v Villasenor, supra.

Finally, turning to the assertion that the accused's wound was of such a nature as to combine maximum disability with minimum permanent damage, again we point to a complete absence of any evidence to support that conclusion in the record. Although the attendant military physician was present in court and testified concerning the accused's injury, no attempt was made to explore the extent of his disability or the nature of its aftereffects. From the description of the wound, for aught we know, accused might well have been able to proceed to Korea without untoward delay, although in fact he was hospitalized for an unstated period.

In sum, we find no evidence in this record, *aliunde* accused's out-of-court statements, that he probably deliberately, rather than accidentally, injured himself. United States v Pedersen, supra. The Government's arguments to the contrary amount to little more than speculation and suspicion, insufficient in themselves to establish the necessary corroboration for such statements. United States v Smith, supra;

United States v Britton, supra. Absent such corroboration, the evidence of accused's guilt is insufficient in law, and the findings of guilty must be set aside.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Army. The charge is ordered dismissed.

Judge KILDAY concurs.

QUINN, Chief Judge (concurring in the result):

I agree with the board of review, but in view of the fact that accused is back on active duty I concur in the result.