*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

————————

**UNITED STATES**
Appellee

**v.**

**Thomas E. BARKER, Airman First Class**
United States Air Force, Appellant

**No. 17-0551**
Crim. App. No. 39086

Argued February 27, 2018—Decided May 21, 2018

Military Judge: James R. Dorman

For Appellant: *Captain Mark J. Schwartz* (argued); *Lieutenant Colonel Nicholas W. McCue.*

For Appellee: *Major J. Ronald Steelman III* (argued*); Colonel Julie L. Pitvorec, Lieutenant Colonel Joseph Kubler,* and *Mary Ellen Payne*, Esq. (on brief).

Judge RYAN delivered the opinion of the Court, in which Judges OHLSON, SPARKS, and MAGGS, joined. Chief Judge STUCKY filed a separate dissenting opinion.

————————

Judge RYAN delivered the opinion of the Court.

At issue in this case[1] is the status of unsworn statements admitted under Rule for Courts-Martial (R.C.M.) 1001A, "Crime victims and presentencing," Exec. Order No. 13,696, 80 Fed. Reg. 35,783, 35,807−09 (June 17, 2015), where the

---

[1] We granted Appellant's petition to review the following issues:

> I. WHETHER THE COURT OF CRIMINAL APPEALS ERRED WHEN IT HELD PROPER FOUNDATION HAD BEEN LAID TO ADMIT EVIDENCE IN AGGRAVATION.

> II. WHETHER THE COURT OF CRIMINAL APPEALS IMPROPERLY CONDUCTED A REVIEW OF THE PREJUDICE RESULTING FROM THE MILITARY JUDGE'S ERRONEOUS ADMISSION OF EVIDENCE IN AGGRAVATION.

statements were offered by the Government, and not by a victim or special victim's counsel. As R.C.M. 1001(a)(1)(B) recognizes, R.C.M. 1001A constitutes the "[v]ictim's right to be reasonably heard." *See also* R.C.M. 1001A(a). R.C.M. 1001A sets forth the rules regarding the victim's rights at presentencing, and facilitates the statutory right to "be reasonably heard" provided by Article 6b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 806b (Supp. II 2012). R.C.M. 1001A is itself part of the presentencing procedure, and is temporally located between the trial and defense counsel's respective presentencing cases. It belongs to the victim, and is separate and distinct from the *government's* right to offer victim impact statements in *aggravation*, under R.C.M. 1001(b)(4).[2]

Here, the United States Air Force Court of Criminal Appeals (AFCCA) concluded that the Government introduced, and the military judge admitted, the victim impact statements under R.C.M. 1001A. *United States v. Barker*, 76 M.J. 748, 754 (A.F. Ct. Crim. App. 2017). Given that there was no compliance with the requirements of R.C.M. 1001A, which contemplates introduction of a sworn or unsworn statement by the victim, the victim's designee appointed pursuant to R.C.M. 1001A(d)–(e), or her counsel, the statements were improperly admitted.

Because we conclude in this military judge-alone case that this error did not substantially influence the sentence, *United States v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009), the decision of the AFCCA is affirmed.

## I.    Facts and Procedural History

On May 16, 2016, a military judge sitting as a general court-martial convicted Appellant, consistent with his pleas, of knowingly and wrongfully possessing and viewing child pornography in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2012). In his stipulation of fact, included in Appendix A (Stipulation of Fact), Appellant admitted to downloading and viewing a total of approximately 155 videos and 12 photographs of children engaging in sexually explicit conduct between June 14, 2014, and April 18, 2015. The children in these videos and photographs appear to range in age from approximately two years

---

[2] The question whether the Government could have admitted these same statements under R.C.M. 1001(b)(4) is not before us.

old to about sixteen years old. The child pornography included violent and sadomasochistic sex acts against children, including the rape of victims as young as two years old.

The Defense Computer Forensics Laboratory analyzed Appellant's electronic equipment and confirmed that Appellant possessed nineteen video files and ten image files involving specific child victims identified by the National Center for Missing and Exploited Children (NCMEC). The NCMEC identified KF as one of the victims depicted in a video referred to as part of the "Vicky series." Appellant's stipulation of fact expressly admitted that he downloaded and viewed one video in the "Vicky series" on at least one occasion during the charged time frame.

At sentencing, trial counsel offered Prosecution Exhibit (PE) 8, which consisted of three victim impact statements purportedly from KF.[3] Trial counsel did not introduce any "accompanying affidavits or testimony to establish the origin of these documents, the circumstances of their creation, or where these documents were maintained." *Barker*, 76 M.J. at 751. Instead, trial counsel merely proffered that they received the documents from the Federal Bureau of Investigation (FBI), and they were " 'redacted already.' " *Id*. All of the statements were prepared before Appellant committed his offenses. *Id*. Despite these issues, the military judge admitted the victim impact statements, over defense counsel's objection, during the presentencing portion of Appellant's trial. *Id*.

The first statement was titled "UPDATED VICTIM IMPACT STATEMENT FROM [redacted] SERIES VICTIM—December 2011." This statement did not connect the declarant of the statement to the "Vicky series." The December 2011 statement includes: "I submit the statement to the court for its use in sentencing in cases in [sic] which involve my images." It is dated and notarized on March 6, 2012, and has a redacted signature.

The second statement was titled "Supplement to Victim Impact Statement of [redacted] Series Victim January 31, 2013." The January 2013 statement directly connected its

---

[3] Because of the redactions, it is difficult to know whether or not KF actually wrote the statements unless we rely on trial counsel's assertion that the FBI provided him with statements from KF.

declarant to the "Vicky series" and expressed some measure of the declarant's desire to be heard at a criminal sentencing hearing:

> I am making this supplement to my prior Victim Impact Statement to make clear that each additional time that another person downloads and sees the computer images that are now known as the "Vicky series" it does me immeasurable additional harm.
>
> Despite feeling hurt each time I learn about another case with my images, I feel strongly that I have a right to know about every case.

The statement is dated January 31, 2013, and has a redacted signature, but is not notarized.

The third statement was titled "UPDATED VICTIM IMPACT STATEMENT FROM [redacted] SERIES VICTIM−September 23, 2013." As with the December 2011 statement, nothing in this statement connected the declarant with the "Vicky series." The September 2013 statement includes the following language: "I submit the statement to the court for its use in sentencings in cases in [sic] which involve my images." This statement is notarized and dated on September 30, 2013, and has a redacted signature.

Appellant's counsel objected to the admission of the statements "for a myriad of reasons," all of which revolved around both the Government's failure to timely apprise the defense of the statement and that the statements were not properly admissible under R.C.M. 1001A. As relevant to the granted issue, defense counsel asserted R.C.M. 1001A was an improper vehicle to admit these statements because trial counsel had no personal knowledge of or contact with the declarant, and trial counsel had not reached out to the declarant to give her an opportunity to appear at the court-martial and provide a statement. R.C.M. 1001A(a). Defense counsel further argued that victim statements cannot be used in perpetuity, and that a new statement should be obtained separately for each individual defendant being sentenced. R.C.M. 1001A(e)(1). The military judge disagreed and admitted PE 8 in its entirety under R.C.M. 1001A.[4] The military judge then sentenced Appellant to thirty months of

---

[4] Nothing (other than assertions by the trial counsel) linked the statements to one another. *Barker*, 76 M.J. at 755−56.

confinement, a bad-conduct discharge, forfeiture of all pay and allowances, and a reduction to E-1. The convening authority approved the sentence as adjudged.

Before the AFCCA, the Appellant argued inter alia, that the military judge erred by admitting the statements purportedly from KF under R.C.M. 1001A. *Barker*, 76 M.J. at 751. The AFCCA addressed the statements as follows:

> Victim impact evidence is a form of aggravation evidence that, with a proper foundation, the Prosecution may introduce during a sentencing hearing under R.C.M. 1001(b)(4). Victim impact is also an appropriate topic for a sworn or (in the case of non-capital cases) unsworn statement offered by a victim in exercising his or her right to be reasonably heard during a sentencing hearing under R.C.M. 1001A(c). For an unsworn statement, the victim may offer the statement orally, in writing, or both. R.C.M. 1001A(e). While the Prosecution did not indicate whether they were offering the statements under R.C.M. 1001(b)(4) or R.C.M. 1001A(e), both the trial defense counsel and the military judge treated the Prosecution's offer as a victim exercising her right to be reasonably heard under R.C.M. 1001A. The rules of evidence had not yet been relaxed on behalf of the Defense. The Prosecution did not attempt to lay the necessary foundation for admission of hearsay victim impact statements under R.C.M. 1001(b)(4) and it appears that, *sub silentio*, the Prosecution was offering the statements under R.C.M. 1001A. An obvious and necessary foundational predicate for a statement offered under R.C.M. 1001A is that the *victim* (not just the Prosecution) wishes the court to consider the statement.

*Id.* at 754.

In describing its requirement of the admissibility of a victim impact statement, the AFCCA further found that:

> In continuing crime cases, such as possession and viewing of child pornography, there is no requirement that a victim prepare a separate statement for each individual case. More-

5

over, the fact that a victim impact statement was authored before an accused's criminal acts does not necessarily make the statement irrelevant to the accused's offenses. However, there must be some evidence establishing a foundational nexus between the victim impact described in the statement and the subsequent offenses committed by the accused.

*Id.* at 755.

Although the AFCCA found that KF was a "crime victim" for purposes of R.C.M. 1001A(b)(1), the lower court held that because the January 2013 statement alone contained both a nexus to the "Vicky series" and some indication of the declarant's intent for the statement to be used in a criminal sentencing hearing, the military judge abused his discretion when he admitted the December 2011 and September 2013 statements. *Id.* at 756. The AFCCA did not consider whether the text of R.C.M. 1001A permitted statements to be admitted under that rule by anyone other than the victim or special victim's counsel, or whether the victim had to intend a statement to be admitted as a victim impact statement in a particular case. Instead, relying on a document of uncertain vintage and pedigree, Appellate Exhibit IV: "Guidance for Use of Victim Impact Statement,"[5] the AFCCA determined

---

[5] Guidance for Use of Victim Impact Statement

Title 18, United States Code, Section 3771(a) provides certain rights to victims of federal crimes. Those rights include the right to be reasonably protected from the accused, the right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding, and the right to be treated with fairness and with respect for the victim's dignity and privacy.

. . . .

To comply with the provisions of 18 U.S.C. § 377l(a)(l), (4), and (8), prosecutors should follow these guidelines when obtaining and using victim impact statements in child pornography cases:

1. When providing this statement, the victim only consented to its use at sentencing, probation, or parole proceedings. Therefore, in order to respect the terms of the victim's consent, this

that the January 2013 statement was sufficient for admissibility under R.C.M. 1001A. *Barker*, 76 M.J. at 756. Because this statement identified the declarant as a victim of child pornography and, according to the lower court, contained some indication of the declarant's intent for the statement to be used in criminal sentencing hearings, the AFCCA concluded the statement was *acquired* for the express purpose of permitting the victim to exercise her right to be reasonably heard, and thus admissible under R.C.M. 1001A. *Id.* In analyzing error with the admittance of two of the three victim impact statements, the AFCCA found no prejudice and affirmed the findings and sentence. *Id* at 757.

## II.   Discussion

We have no doubt that KF is indeed the child in the "Vicky series," and that she is a "victim" of child pornography for the purposes of R.C.M. 1001A. Under R.C.M. 1001A(b)(1), a "crime victim" is "an individual who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of an offense of which the accused was found guilty." Child pornography is a continuing crime: it is "a permanent record of the depicted child's abuse, and the harm to the child is exacerbated by [its] circulation." *Paroline v. United States*, 134 S. Ct. 1710, 1716−17 (2014) (alteration in original) (internal quotation marks omitted) (citation omitted); *see also United States v. Goff*, 501 F.3d 250, 259 (3d Cir. 2007) (recognizing that even those "who 'merely' or 'passively' receive or possess child pornography directly contribute to [the child's] continuing victimization").

---

statement should not be used for any other type of proceeding.

2. Victims may withdraw or revise their statement. Therefore, prosecutors should obtain the statement as close as possible to the sentencing date for each individual defendant, in order to best ensure that the most up-to-date statement is used at that sentencing.

a) Once obtained, the statement should only be used in connection with the individual defendant being sentenced. Rather than re-using statements in subsequent sentencings, a victim impact statement should be obtained separately for each and every individual defendant being sentenced.

But the status of KF as a "victim" is not the point of contention before this Court. Rather, even assuming (which for the sake of argument alone we will) that the "statements" in PE 8 were KF's, the question is whether they could be admitted under R.C.M. 1001A, in their extant form, without the participation of KF or her advocate. We conclude that they could not.[6] However, under the circumstances of this case we

---

[6] While the pretrial agreement in this case included a "waive all motions which may be waived" provision, our decision turns on the impropriety of the introduction of statements absent compliance with the R.C.M. 1001A, in the face of defense objection on that basis among others. We reject the notion that a waive all waivable motions provision entered at pretrial provides the government carte blanche to introduce at sentencing information that does not conform to the rules, or to make arguments that are prohibited by the law. *Cf. United States v. Mooney*, 77 M.J. 252, 254−55 (C.A.A.F. 2018) (holding that a waive all waivable motions clause did not apply to the convening authority's subsequent action: "because this issue did not arise until post-trial, there was no motion to be made during the court-martial.") We decline to adopt a reading of a waive all waivable motions provision in a pretrial agreement that either shields the government from the requirements of R.C.M. 1001A or restricts the accused ex ante from objecting to any and all *future* infirmities unrelated to the plea. *Cf. Class v. United States*, 138 S. Ct. 798, 805 (2018) ("A valid guilty plea also renders irrelevant—and thereby prevents the defendant from appealing—the constitutionality of case-related government conduct that takes place *before* the plea is entered"; "a valid guilty plea relinquishes any claim that would contradict the 'admissions necessarily made *upon entry* of a voluntary plea of guilty.'") (emphasis added) (citation omitted); *United States v. Bradley*, 68 M.J. 279, 281 (C.A.A.F. 2010) ( "[a]n unconditional plea of guilty waives all nonjurisdictional defects at earlier stages of the proceedings"). Of course, the government remains free to negotiate pretrial specific provisions related to sentencing, such as stipulations of expected testimony, waiver of foundational requirements, etc. *But see* R.C.M. 705(c)(1)(B) (proscribing the enforcement of terms in a pretrial agreement that would deprive an accused of certain rights, including "the right to complete sentencing proceedings"); *Manual for Courts-Martial, United States*, Analysis of the Rules for Courts-Martial app. 21 at A21−40 (2012 ed.) (*MCM)* ("Subsection (1)(B) lists certain matters which cannot be bargained away. This is because to give up these matters would leave *no substantial means to ensure judicially that . . . the sentencing proceedings met acceptable standards*." (emphasis added) (citations omitted)).

hold that the statements did not have a substantial influence on the sentence.

## A.

Article 6b, UCMJ, outlines the rights of a victim within the military justice system, including the right to: "reasonable, accurate, and timely notice" of a range of proceedings related to an accused. Article 6b(a)(2), UCMJ. These rights include the reasonable right to "confer with the counsel representing the Government" in any such proceeding, Article 6b(a)(5), UCMJ, and the right to be "reasonably heard" in public hearings related to pretrial confinement, a sentencing hearing, the public proceeding of the service clemency, and a parole relating to the offense. Article 6b(a)(4), UCMJ. Provision is also made for the appointment of an individual to assume the Article 6b, UCMJ, rights of a victim who is under the age of eighteen, or "incompetent, incapacitated, or deceased." Article 6b(c), UCMJ.

R.C.M. 1001A(b)(4)(B) effectuates the right to be heard at presentencing, and thus provides that, in noncapital cases, the victim has the right to be reasonably heard through a sworn or unsworn statement. The contents of the statements may include "victim impact or matters in mitigation." R.C.M. 1001A(c). The victim may use an unsworn statement that can be oral, written, or both, and the victim may not "be cross-examined by the trial counsel or defense counsel upon it or examined upon it by the court-martial." R.C.M. 1001A(e). Indeed, victim testimony under R.C.M. 1001A does not constitute witness testimony. R.C.M. 1001A(a). However, the prosecution or defense may rebut any statements of fact in an R.C.M. 1001A(e) statement.

## B.

We agree with the AFCCA that the Government admits aggravation evidence, to include victim impact statements, under R.C.M. 1001(b)(4), and victims exercise their right to reasonably be heard at presentencing under R.C.M. 1001A. *Barker*, 76 M.J. at 752. We also agree with the AFCCA's conclusion that the statements at issue in this appeal were not admitted by the Government as aggravation evidence under R.C.M. 1001(b)(4). *Id.* at 754. Rather, they were offered by the Government under R.C.M. 1001A. *Id.* But we part ways with the AFCCA on whether the January 2013 statement in this case was properly offered by the Government under R.C.M. 1001A solely because it was possible to

glean from the circumstances that the Government *acquired it* to permit KF (with whom trial counsel never spoke) to exercise her right to be heard, especially given that there was no indication that KF intended to "be heard" at Appellant's sentencing hearing.[7]

Interpreting R.C.M. 1001A is a question of law, which we review de novo. *United States v. Leahr*, 73 M.J. 364, 369 (C.A.A.F. 2014) (citing *United States v. Hunter*, 65 M.J. 399, 401 (C.A.A.F. 2008)). We conclude that the rights vindicated by R.C.M. 1001A are personal to the victim in each individual case. Therefore, the introduction of statements under this rule is prohibited without, at a minimum, either the presence or request of the victim, R.C.M. 1001A(a), the special victim's counsel, *id.*, or the victim's representative, R.C.M. 1001A(d)–(e).[8]

This Court reviews "a military judge's decision to admit evidence for an abuse of discretion." *United States v. Humpherys*, 57 M.J. 83, 90 (C.A.A.F. 2002) (citation omitted). A military judge abuses his discretion when he admits evidence based on an erroneous view of the law. *United States v. Lubich*, 72 M.J. 170, 173 (C.A.A.F. 2013) (citing *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008)). Assuming without deciding such victim impact statements are evidence,[9] here, the military judge's understanding of the law was erroneous, and thus, he abused his discretion.

---

[7] We note that whatever the genesis or legal import of the as yet unidentified Appellate Exhibit IV, it is clear that its dictate to obtain up-to-date statements for use in connection with an individual sentencing case was overlooked by the AFCCA.

[8] Nothing in this opinion prohibits the government from seeking to admit victim impact evidence in aggravation under R.C.M. 1001(b)(4).

[9] The Government and the AFCCA have taken various positions on this question. *Compare Barker*, 76 M.J. at 754–55 (treating victim impact statements under R.C.M. 1001A as subject to the Military Rules of Evidence (M.R.E.), specifically M.R.E. 403); Final Brief on Behalf of United States at 4, 5, 12–14, 25, 31, 35, *United States v. Barker,* 17-0551/AF (Dec. 8, 2017) (referring to the victim impact statements in this case as evidence), *with* United *States v. Hamilton*, 77 M.J. 579, 585–86 (A.F. Ct. Crim. App. 2017) (finding that victim impact states are not evidence subject to the M.R.E., overruling *Barker*, 76 M.J. at 754–55, insofar as it held otherwise); Oral Argument at 20:45–21:30; 33:50–35:05,

In the discussion of PE 8, the trial counsel stated how the statements came to him from the FBI:

> Given the nature of these cases, her contact information is not necessarily available, and so the FBI, in sending it to me, it's a part of a database that they have, you can see many of these redactions were even — they came to the government redacted already, and so victim K.F., and victims like her, do not want to be contacted because that's all they would be doing is being contacted for these cases.[10]

The military judge interpreted R.C.M. 1001A, as drafted, to give enough "leeway" to allow PE 8's to be proffered by the Government (without any input from the victim or her advocate) because it was more probative under the M.R.E. 403 balancing test than the danger of unfair prejudice.

The problem, of course, is that this approach ignores the requirement of Article 6b, UCMJ, that victims be contacted and have the choice to participate and be consulted in cases where they are victims. Article 6b(a)(2)−(5), UCMJ. It further ignores the fact that the R.C.M. 1001A process belongs to the victim, not to the trial counsel. R.C.M. 1001A(a). Under the rules devised by the President to effectuate congressional intent, *see* Article 36(a), UCMJ, 10 U.S.C. § 836(a) (2012); *United States v. Smith*, 13 C.M.A. 105, 118–19, 32 C.M.R. 105, 118−19 (1962), the crime victim has an inde-

---

*United States v. Barker*, 17-0551/AF (Feb. 27, 2018) (Government counsel asserting that victim impact statements admitted under R.C.M. 1001A are not evidence). Since determination of that issue is not necessary to resolution of this case, we will decide it in *United States v. Hamilton*, 18-0135/AF, where the issue can be briefed.

[10] If true, this exposes both a conundrum, and a further problem exposed by the procedure whereby the statements were procured and introduced: Article 6b, UCMJ, mandates certain rights for victims, yet it appears abundantly clear that the trial counsel in this case did not himself provide reasonable, accurate, and timely notice to KF of the trial or sentencing proceeding, nor was KF afforded a reasonable opportunity to confer with trial counsel. Because KF was not informed of the trial or the sentencing proceeding, her right to be reasonably heard and her right not to be excluded from a proceeding, the fundamental underpinnings of Article 6b, UCMJ, were stymied.

pendent "right to be reasonably heard at a sentencing hearing," R.C.M. 1001A(a), though the military judge may permit the victim's counsel to "deliver all or part of the victim's unsworn statement." R.C.M. 1001A(e)(2). All of the procedures in R.C.M. 1001A contemplate the actual participation of the victim, and the statement being offered by the victim or through her counsel. Moreover, they assume the victim chooses to offer the statement for a particular accused, as they permit only the admission of information on victim impact "directly relating to or arising from the offense of which the accused has been found guilty." R.C.M. 1001A(b)(2).

In this case, trial counsel appears to have had no contact with KF, KF did not in fact participate in the proceedings, and there is no indication that KF was even aware of Appellant's trial. Most importantly, the statements were not offered by either KF or her advocate as R.C.M. 1001A requires. Thus, the military judge abused his discretion in admitting these statements under R.C.M. 1001A.

## C.

When there is error in the admission of sentencing evidence, the test for prejudice "is whether the error substantially influenced the adjudged sentence." *United States v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009) (citation omitted). When determining whether an error had a substantial influence on a sentence, this Court considers the following four factors: "(1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *United States v. Bowen*, 76 M.J. 83, 89 (C.A.A.F. 2017) (internal quotation marks omitted) (quoting *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999)). An error is more likely to be prejudicial if the fact was not already obvious from the other evidence presented at trial and would have provided new ammunition against an appellant. *United States v. Harrow*, 65 M.J. 190, 200 (C.A.A.F. 2007).

Here, the Government's case was exceptionally strong, and Appellant's guilt was laid out in vivid detail in the Stipulation of Fact. *See generally* Appendix A. The maximum sentence available in this case was a dishonorable discharge, confinement for twenty years, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade, *MCM* pt. IV, para. 68b.e.(1). Appellant's pretrial agreement had a sentence cap of four years, and he received only two and a half years, despite the admission of KF's statements, and

despite the weakness of Appellant's sentencing case, which consisted of photographs of Appellant that show him in a positive light, awards received, character letters, and a personal statement.

Moreover, it is highly relevant when analyzing the effect of error on the sentence that the case was tried before a military judge, who is presumed to know the law. *United States v. Bridges*, 66 M.J. 246, 248 (C.A.A.F. 2008) (citation omitted); *United States v. Erickson*, 65 M.J. 221, 224 (C.A.A.F. 2007).[11] While the theme of the letters was on constant revictimization, that devastating facet of child pornography is itself settled law, *Osborne v. Ohio*, 495 U.S. 103, 111 (1990) (citation omitted) (recognizing that child pornography causes child victims continuing harm), and why child pornography is both considered a continuing offense, *Paroline*, 134 S. Ct. at 1715, and has different rules than obscenity. *New York v. Ferber*, 458 U.S. 748, 759−61 (1982).

As depicted in the stipulation of fact, the age of the victimized children and the manner in which they were sexually assaulted, was particularly horrific. We are convinced it was that, rather than the heavily redacted and tenuously connected letters, that influenced the sentence. In other words, many of the themes and harms contained in the improperly admitted letters are well known to the law, and thus are presumed to have been known by the military judge.

### III. Judgment

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

---

[11] We thus presume that the military judge disregarded information in the statements regarding the acts of other individuals, such as stalking and harassing the victim, that did not directly relate to or arise from Appellant's convictions for the possession and viewing offense. Moreover, we note that the military judge specifically stated on the record that Appellant would "not be sentenced for anything related to the distribution of these images."

DEPARTMENT OF THE AIR FORCE
UNITED STATES AIR FORCE JUDICIARY

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | **STIPULATION OF FACT** |
| v. | ) | |
| | ) | |
| A1C THOMAS E. BARKER | ) | |
| 22d Medical Support Squadron (AMC) | ) | |
| McConnell AFB, Kansas | ) | 16 May 2016 |
| | ) | |

It is hereby stipulated and agreed, by and between the trial and defense counsel, with the express consent of A1C Thomas E. Barker (hereinafter "the Accused"), that the following facts are true and admissible for all purposes. It is also stipulated that the chain of custody for all documents, information, evidence, and attachments referenced herein is proper. It is also stipulated that the documents, information, evidence, and attachments referenced herein are admissible for all purposes, unless otherwise indicated.

1.    The Accused is assigned to the 22d Medical Support Squadron at McConnell Air Force Base, Kansas. He entered active duty on 26 February 2013 and has 3 years and 2 months of total active military service. The Accused is 24 years old and single with no dependents. He arrived on station at McConnell AFB on 5 July 2013. At all times relevant to the charged offenses, the Accused has been on continuous active duty in the United States Air Force.

### Charge, Specification 1 – Possession of Child Pornography

2.    From 14 June 2014 to 18 April 2015, the Accused knowingly and wrongfully downloaded and viewed a total of approximately 155 videos and 12 photographs of children engaging in sexually explicit conduct. The children in these videos and photographs appear to range in age from approximately 2 years old to about 16 years old.

3.    On 9 February 2015, Detective Raymond Alverson, Wichita Police Department, began downloading videos of suspected child pornography from Internet Protocol (IP) address 174.70.147.136, which a subpoena to Cox Communications, Inc., the Internet Service Provider (ISP), subsequently revealed was registered to the Accused at his home address: 53398 Lawrence Court, Apartment 339, McConnell Air Force Base, Kansas 67221. Det Alverson is assigned to the Internet Crimes Against Children (ICAC) task force, a national network of federal, state, and local law enforcement entities with specialized training and expertise in investigating and prosecuting offenders who use the Internet, online communication systems (*e.g.*, Skype, Snapchat, etc.), or computer technology to sexually exploit children.

4.    To download the videos from the Accused, Det Alverson utilized a law enforcement program called Gridcop. This program searches public folders that users make available to each other for the exchange of files via various peer-to-peer networks, such as Gnutella P2P and Ares. Gridcop scans the unique file identifiers, called hash values, of the files in these public folders and compares them to a registry of hash values corresponding to known images of child

pornography. When there is a match, Gridcop alerts law enforcement that a particular IP address has files of suspected child pornography that the user has made available for others to download. Using a modified peer-to-peer program such as ShareazaLE, law enforcement officers are able to establish a one-to-one connection with a particular user and download the suspected images of child pornography. Once downloaded, the officers view the images to confirm that they do in fact contain images of children engaged in sexually explicit activity. Law enforcement then obtains a subpoena from the ISP to identify the individual to whom the IP address is registered.

5.    Using this process, in February 2015, Gridcop identified the Accused's IP address as having at least 57 files of suspected child pornography. Between 9 February and 16 April 2015, Det Alverson completed the download of 27 videos and partially downloaded 19 other videos from the Accused's computer, all of which depicted children engaging in sexually explicit conduct. On 15 April 2015, Cox Communications, Inc. responded to a valid subpoena, indicating that the IP address from which Det Alverson had downloaded the 27 videos of child pornography was registered to the Accused at his dormitory room located on McConnell Air Force Base, Kansas. Det Alverson contacted the McConnell detachment of the Air Force Office of Special Investigations (AFOSI) and transferred the investigation.

6.    Pursuant to a valid Authority to Search and Seize, on 17 April 2015, AFOSI Special Agents (SA) Jared Pingree, Jonathan Williams, and Ronnie Joseph searched the Accused's dormitory room and seized a number of electronic media devices, including a Lenovo desktop computer, a Sony Vaio laptop computer, and a Toshiba 2 terabyte external hard drive. Attachment 1 to this stipulation contains photographs taken during that search. SA Pingree and SA Joseph also interviewed the Accused after they completed the search of his room.

7.    Following over an hour of rapport building that involved talking with the Accused over a pizza dinner, the Accused agreed to waive his right to counsel and speak with AFOSI agents. After a valid waiver of his Article 31 rights, the Accused told AFOSI generally how peer-to-peer networks such as LimeZilla work. LimeZilla is the peer-to-peer network the Accused used to download the child pornography subsequently found on his media devices. He also used these networks to download music. He would mass download music and pornography. He told the agents he didn't know how to upload files onto the site, he only knew how to download. He would download various types of pornography in mass downloads. He also knew a shared folder would be created as a condition of downloading the peer-to-peer network and generally that somebody could download files from him, but was unaware if anybody had downloaded anything from him.

8.    The Accused told AFOSI how he downloaded mass amounts of pornography. This ranged from "amateur porn" to "triple D bra size porn" to "bestiality." According to the Accused, some of the downloads were not for pleasure, but like the bestiality, were out of curiosity. The Accused initially denied searching for, downloading, or possessing child pornography, stating that he stays away from phrases such as "R@ygold," a term commonly used to search for child pornography. After AFOSI went into more detail regarding the evidence that Det Alverson had obtained, the Accused finally admitted to downloading, possessing, and viewing videos of children engaged in sexually explicit conduct. Despite his earlier assurances otherwise, the Accused also stated that he had, in fact, used the term "R@ygold" to search for child pornography, which sometimes resulted in, for example, videos involving father-daughter

scenarios with children from eight to ten years old. Though the Accused could not be certain, he stated he only downloaded a total of approximately 60 videos. The Accused told AFOSI that he downloaded the videos because he was "curious," and offered to cooperate with AFOSI to get help for his "porn addiction." A subsequent forensic examination of his laptop and desktop computers revealed that he had in fact possessed and viewed approximately 155 videos and 12 photographs, all of which depict children engaging in sexually explicit conduct.

9. In October 2015, AFOSI requested that the Defense Computer Forensics Laboratory (DCFL) conduct a forensic examination of the Accused's media devices, specifically focusing on 41 selected videos. DCFL provides comprehensive analysis of digital evidence and delivers digital and multimedia evidence processing, forensic examinations, and expert testimony. DCFL operations have been accredited for "Forensic Science Testing" by the American Society of Crime Laboratory Directors/Laboratory Accreditation Board (ASCLD/LAB), the preeminent authority for accredited crime labs in the United States, since 9 September 2005.

10. Mr. Andrew Siske, a forensic examiner at DCFL, conducted a search of the Accused's desktop computer, laptop computer, and Toshiba 2 terabyte external hard drive and assembled a report of his findings, which is attached to this stipulation as Attachment 2. The forensic examination revealed that the Accused possessed multiple videos of children engaged in sexually explicit conduct, which were located on the Accused's laptop computer and desktop computer. Mr. Siske also found 12 images showing children engaged in sexually explicit conduct. These 12 images were located on the Toshiba external hard drive within the folder "\porn\hentai\Pics\child\".

11. As part of his examination, Mr. Siske compiled two spreadsheets detailing the forensic data associated with the child pornography files found on the Accused's desktop computer, laptop computer, and Toshiba 2 terabyte external hard drive. Attachments 3 and 4 are the spreadsheets Mr. Siske compiled during his examination. Lines 22, 37, and 55 on Attachment 3 are not child pornography. The Accused had on his media devices the following files, among others:

- **Title:** (Pthc) 8yo black girl raped by white man (she screams - very good).avi
  **HASH Value:** 3992f2a8713bc54cfd7e92dacdbe0873
  **Description:** This video is 2:23 in length. It shows an approximately six- to eight-year-old African-American girl lying on a bed on her side under a blanket. The camera is angled up at the girl from the foot of the bed, showing only the girl's feet protruding from the blanket. An adult white male enters the frame from the left and lifts the blanket up to the girl's waste, exposing her genitalia, anus, and bare legs. The girl places her hand over her genitalia in an attempt to cover it from the camera's view. As the girl struggles, the adult male moves the girl's hand away from her genitalia and anus. He then pries open her vagina and anus as the camera zooms in for close ups of the girl's genitalia and anus. The white male then begins rubbing the girl's vagina and anus as she struggles to stop him. The girl tries to force her legs together to prevent the man from digitally penetrating her vulva and anus. As she struggles, the man turns her onto her stomach so that she is face down on the bed and pries her legs open. Once again, the girl covers her genitalia and anus with her hand. Facing away from the girl's head and towards the camera, the man gets on top of the girl, straddles her midsection, and pins her hands and legs under his legs. The man's erect penis is in view as he digitally penetrates the girl's vulva. The girl—pinned to the bed

under the weight of the man—screams as she struggles to prevent him from raping her. The Accused viewed this video on at least one occasion during the charged timeframe.

- **Title:** [ロリ] (Pthc) Mix Hot Lolitas.avi
  **Hash Value:** 7c36e135c01db32484e71a1e124e23ce
  **Description:** This video is 18:34 in length and contains at least ten separate scenes of approximately one to four minutes each. These scenes depict girls ranging in ages from approximately 8-12 years old masturbating adult males and performing oral sex on adult males. At the conclusion of each of these scenes, the adult male ejaculates into the mouths and onto the faces and bodies of the girls. In multiple scenes, the adult male grabs the head and hair of the girl before ejaculating into their mouths and onto their faces, while the girls gag. For example, the girl (K.F.) in the scene beginning at about 12:20 was between 10-11 years old at the time the video was taken. The adult male is her father, who was eventually apprehended in Hong Kong and extradited to the United States after he fled prosecution. This scene shows K.F. lying on a bed masturbating her father's erect penis as he stands next to the bed. She then performs oral sex on him. At one point, her father grabs K.F.'s hair and begins thrusting his erect penis in and out of her mouth. He then holds her head down and ejaculates into her mouth. She swallows before beginning oral sex again as he strokes his erect penis. He then takes her hand and places it on his penis so that she can stroke his erect penis. This scene corresponds to the National Center for Missing and Exploited Children (NCMEC) series "Vicky," and is one video among many that her father created over a two-year period when K.F. was 10-11 years old. The Accused viewed this video on at least one occasion during the charged timeframe.

- **Title:** (pthc pedo) Kids porno - clip collection(1).avi
  **Hash Value:** 32e19e7d5234269930de45c9cee7ee5e
  **Description:** This video is 53:08 in length and contains over 20 scenes of prepubescent girls and boys engaging in a variety of sex acts with adult females, adult males, and other children. The first scene in this video shows an approximately two-year-old infant girl viewing child pornography with an adult female on a laptop. The next clip shows an adult female exposing, then digitally penetrating the infant's vulva and anus. The adult female then performs oral sex on the infant while penetrating the infant's anus with her finger. Other scenes show adult males having vaginal intercourse and anal sex with infants who are approximately two years old. In two other scenes, prepubescent girls perform oral sex on prepubescent boys and have vaginal intercourse with those boys. For instance, the scene beginning at approximately 46:48, a boy and a girl, each of whom appear to be between 6-10 years old, take turns performing oral sex on an adult male. The next clip shows the boy sitting on a couch as the girl straddles the boy. The adult male then forces the boy's penis in the girl's anus. Both the boy and girl face the camera as she moves up and down on the boy's penis. The girl, still on top of the boy, turns to face the boy. She and the boy then have vaginal intercourse as the adult male digitally penetrates the girl's anus. The next clip shows the adult male sitting on the couch facing the camera with the boy on his left and the girl on his right. As the girl performs oral sex on the adult male, the adult male masturbates the boy. Another adult male is sitting on the couch to the right of the girl. The clip concludes with an adult male ejaculating into the mouth of the girl as she performs oral sex on him. One of the scenes in this video corresponds to the NCMEC

series "RCA." The victim in the RCA series was 4-5 years old at the time the video was made, and the male depicted in the scene is the victim's father.

- **Title:** 5Yo Boy Fucked From Underneah By Big-Cock Man-Pthc Pedo Kiddy-3.32(25.0Mb).mpg
  **Hash Value:** 6c0d7566a20e99b4a8c09d19c79d4dbb
  **Description:** This video is 3:32 in length. It shows an adult male who is lying on his back on a bed. The adult male's penis is anally penetrating an approximately 6-8 year-old boy who is lying on his back on top of the man with his back arched towards the man's head. The boy's flaccid, prepubescent penis is visible as the adult male thrusts his erect penis in and out of the boy's anus. This video corresponds to the NCMEC series "Dalmations." The Accused viewed this video on at least one occasion during the charged timeframe.

- **Title:** [boy+man] 9yo Jap Boy Anal Raped And Get Cummed Inside Ass (2014) ~~~ pthc creampie opva kdv pedo gay bibcam kids 11yo child rbv.avi
  **Hash Value:** b62565297228348c61666626e887a6c4
  **Description:** This video is 1:58 in length. It shows a boy who is approximately nine years old lying naked face down on a mat on the floor. An adult male is thrusting his erect penis into the boy's anus while the boy groans in pain. The adult male turns the camera to show a close up of the boy's grimacing face. The camera then pans back to show the adult male anally penetrating the boy. The adult male ejaculates into the boy's anus. After pulling his penis out of the boy's anus, the adult male spreads the boy's buttocks to expose the semen seeping from the boy's anus. The Accused viewed this video on at least one occasion during the charged timeframe.

- **Title:** (Pthc 564cm)Opva 2012 Compilation Remixed (68cm05s).avi
  **Hash Value:** 6b727fe72f47d62277fc3ff402190bce
  **Description:** This video is 1:08:05 in length and contains over 40 scenes of prepubescent girls and boys engaging in a variety of sex acts with adult females, adult males, and other children. The video opens with a banner stating, "2012: REMIXED FOR MAXIMUM PLEASURE." It then progresses month-by-month with various scenes of children engaged in sex acts. The children range in age from approximately 2-13 years old. For example, one scene depicts an adult male peeing in the face of an approximately eight-year-old girl while she sits in a bathtub. Another scene depicts an adult male penetrating an approximately two-year-old infant girl's anus with anal beads as she struggles to prevent the act. It ends with the adult male ejaculating onto the infant girl's vulva and anus while he rubs his semen into her vagina and anus. Beginning at about 1:01:30, a 4-5 year-old girl is shown lying on her back on a bed naked with her legs spread apart. This scene spans a total of a couple minutes and is broken up by other scenes of children engaged in sex acts. With respect to this scene, the child's mother enters the frame and begins performing oral sex on the girl. She then penetrates the girl's vagina with beads while performing oral sex on her. The scene then shows the girl holding a dildo against her vulva as her mother again penetrates her vulva and anus with beads. The scene then shows the mother lying on her back on the bed as the girl performs oral sex on her and penetrates her mother's vulva with a dildo. The scene ends with the girl's mother rubbing a vibrator on the child's vulva and then digitally penetrating her vulva. This scene was shot in 2012 in the master bedroom of the mother's trailer in Florida. The man filming the scene was the girl's stepfather. In

2012, the girl's mother and stepfather began producing sexually explicit videos involving the girl and posting them on the internet. This video corresponds to the NCMEC series "Mother Full 2012." The Accused viewed this video on at least one occasion during the charged timeframe.

Attachment 5 contains the 6 video files listed above. Attachment 6 contains the remaining files of child pornography found on the Accused's desktop computer, laptop computer, and Toshiba 2 terabyte hard drive.

12. The forensic examination also revealed that in addition to the term "R@ygold," the Accused used the term "Pthc"—which stands for "pre-teen hard core," a term commonly used to search for child pornography—to locate images and movies of child pornography to download to his computer via the peer-to-peer network LimeZilla. Additionally, seven child pornography videos found on the Accused's desktop computer had creation times ranging from 0144 to 0211 on 16 April 2015. On multiple occasions during that timeframe, the Accused accessed websites titled "Loliwood Studios: Child Erotica at its Best" and "YoungLove | Stories". These websites contain written stories describing children engaged in sexual acts with adults and with other children.

13. Of the child pornography videos and images found on the Accused's media devices, 19 video files and 10 image files were positively identified by NCMEC as containing depictions of actual children. Because some of these videos were lengthy "compilations" of multiple scenes of child pornography, some of the files contained numerous NCMEC-confirmed victims. NCMEC is a non-profit organization dedicated to eliminating crimes against children. One of the functions of NCMEC is to identify child victims within sexual exploitation images. When a child is identified within a particular image, NCMEC compiles information relating to that particular image. For example, the name and age of the child, the hash value associated with the image, and any victim impact statement provided by that child. NCMEC maintains a repository of known hash values. During the forensic process, the hash values for the picture files within the evidence media is compared with the hash values contained within the NCMEC database. Columns AC – AE on Attachments 3 and 4 catalogue the child pornography files on the Accused's media devices that returned as positive matches for known images of child pornography maintained by NCMEC.

14. The DCFL analysis also revealed that in addition to the videos and images of child pornography located on the Accused's computer at the time AFOSI executed the search authorization on 17 April 2015, the Accused possessed and viewed approximately 92 other videos depicting children engaged in sexually explicit conduct that he had deleted prior to 17 April 2015. Adding these totals together, the Accused possessed and viewed a total of approximately 155 videos and 12 images of children engaging in sexually explicit conduct.

15. The Accused agrees and admits that between on or about 14 June 2014 and on or about 18 April 2015, at or near McConnell Air Force Base, Kansas, he knowingly and wrongfully possessed child pornography (*i.e.*, visual depictions of actual minors engaging in sexually explicit conduct). The Accused knew that possessing child pornography was wrongful, yet he intentionally sought out child pornography in order to gain possession of it for his own use.

Further, the Accused's possession of child pornography was service discrediting because such a crime lowers the esteem of the military in public opinion.

### Charge, Specification 2 – Viewing of Child Pornography

16. When the Accused searched for and downloaded child pornography, he viewed the videos and images he received. The videos and images he viewed are of children ranging in age from about approximately 2 to 16 years old engaging in sexually explicit conduct. All of the videos the Accused viewed involve children performing sexual acts, while the photographs depict a lascivious display of the genitalia.

17. The Accused agrees and admits that on more than one occasion between on or about 14 June 2014 and on or about 18 April 2015, at or near McConnell Air Force Base, Kansas, he knowingly and wrongfully viewed child pornography (*i.e.*, visual depictions of actual minors engaging in sexually explicit conduct). The Accused knew that he was searching for child pornography and that viewing child pornography is wrongful. He viewed child pornography on more than one occasion during the charged time frame. Further, the Accused's viewing of child pornography was service discrediting because such a crime lowers the esteem of the military in public opinion.

### Attachments

1. Photographs from 17 April 2015 search of the Accused's dormitory room (DVD)
2. DCFL Report (13 pages)
3. Microsoft Excel spreadsheet titled "Report Item 1 Files" (DVD)
4. Microsoft Excel spreadsheet titled "Report Item 2 Files" (DVD)
5. **CONTRABAND** 6 Videos of Child Pornography (DVDs)
6. **CONTRABAND** 68 Videos/Images of Child Pornography (DVDs)

THOMAS E. BARKER, A1C, USAF
Accused

Date    16 May 2016

CASEY W. HINSON, Capt, USAF
Defense Counsel

Date    16 May 2016

STEPHEN D. MAXWELL, Lt Col, USAF
Trial Counsel

Date    16 May 2016

ANDREW PAULSON, Capt, USAF
Assistant Trial Counsel

Date    16 May 2016

Chief Judge STUCKY, dissenting.

I agree with Judge Ryan's convincing analysis of the relationship between Rules for Courts-Martial 1001(b) and 1001A, as they apply to victim impact statements. But I see no need to reach the issue in this case. Appellant waived his objection to the admission of the victim impact statements and, therefore, was precluded from raising the issue before this Court. I would vacate the grant of review as being improvidently granted. Therefore, I respectfully dissent.

### I. Background

During Appellant's preliminary hearing, held pursuant to Article 32, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 832 (Supp. I 2013), the hearing officer accepted for consideration a document entitled "Updated Victim Impact Statement from 'Vicky' Series Victim—December 2011," and made it part of his report. On February 29, 2016, both Appellant and a defense paralegal acknowledged receiving a copy of the report.

On April 4, 2016, as part of a plea agreement, Appellant agreed to waive all waivable motions and plead guilty unconditionally to two specifications of the Charge. He did not condition his offer on an agreement that the trial counsel not submit victim impact statements or on Appellant's ability to object to their admission on appeal. In exchange for Appellant's guilty plea, the convening authority agreed to dismiss Specification 3 of the Charge and to cap the approved sentence.

The prosecutor advised the defense before trial that the victim impact statements would indeed be introduced during sentencing. There is no evidence in the record that Appellant attempted to renegotiate or withdraw from the plea agreement.

When Appellant was arraigned, the military judge advised him that any motions for appropriate relief should be made at that time. Appellant made no motions and entered a plea of guilty in accord with his plea agreement. During the plea inquiry, the military judge discussed the terms of the plea agreement, specifically the provision to waive all waivable motions.

> MJ: [The plea agreement] states that you will waive all motions which may be waived under the Rules for Court-Martial, including motions such as motions to suppress ….
>
> Captain Hinson, what motions would you have made if not for this provision in the pretrial agreement?
>
> DC: May I have a moment, Your Honor?
>
> MJ: You may.
>
> [Defense counsel conferred with the accused]
>
> DC: Your Honor, we discussed a few motions, but one in particular was the suppression potentially of the search warrant to come in his room and retrieve the electronics from his room that may have contained the images. And I discussed that with Airman Barker and he understands that by accepting this pretrial agreement that he has to waive any potential motions in this case.
>
> MJ: Okay. You mentioned you had multiple motions; what would have the other motions been?
>
> DC: I'll just—I'll just say that one motion, sir.

(Second set of brackets in original.)

Thereafter, during an extensive colloquy with Appellant over the meaning and effect of the waive all waivable motions provision in the plea agreement, Appellant agreed to give up his right to raise such motions in order to get the benefit of the terms of the plea agreement. Nevertheless, he objected during sentencing proceedings to the admission of the victim impact statements.

During his lengthy justification for his objection, the defense counsel submitted to the court a document entitled "Guidance for Use of Victim Impact Statement." The military judge overruled the objection and admitted the three statements purportedly made by the victim.

## II. Discussion

The majority rejects "the notion that a waive all waivable motions provision entered at pretrial provides the government carte blanche to introduce at sentencing information that does not conform to the rules, or to make

arguments that are prohibited by the law." *United States v. Barker*, __ M.J. __, __ n.6 (8 n.6) (C.A.A.F. 2018). I agree that such a provision does not entitle the prosecution to present all matters of any nature to the factfinder. Nor is Appellant waiving the right to object to evidence of which he has not been placed on notice. But victim impact statements are not of such a nature as to be generally inadmissible, and Appellant was clearly on notice that they would be presented. The waive all waivable motions provision would merely have permitted the prosecution to present the statements without the authentication normally required by the rules of evidence.

In this case, the defense was well aware before trial of the existence of the victim impact statements. The preliminary hearing officer provided both counsel and Appellant with copies, and the prosecutor advised that the statements would be introduced during sentencing. The defense counsel was less than candid with the military judge during their discussion of which motions the defense counsel had considered raising. Not to tip his hand and give the prosecution an opportunity to withdraw from the plea agreement before Appellant had substantially complied with his obligations under the deal, the defense counsel failed to mention suppression of the victim impact statements as a possible motion. But as the record clearly shows, the defense counsel was fully prepared to argue against consideration of the statements, going so far as to present the military judge with Appellate Exhibit IV to support his position.

Under the circumstances of this case, the waive all waivable motions provision of Appellant's plea agreement signifies his knowing and intelligent waiver of the issue, leaving no error to correct on appeal. *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009); *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009). Although the Courts of Criminal Appeals have plenary authority to review cases despite an appellant's waiver of all waivable motions and unconditional guilty plea, this Court does not. *United States v. Chin*, 75 M.J. 220, 222–23 (C.A.A.F. 2016). "Waiver at the trial level continues to preclude *an appellant* from raising the issue before either the CCA or this Court." *Id.* at

223. Therefore, this Court should vacate Appellant's petition for grant of review.